**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NAVAJO NATION,<br>　　　　　*Plaintiff-Appellant*,<br><br>　　　　　v.<br><br>DEPARTMENT OF THE INTERIOR;<br>RYAN ZINKE[*], Secretary of the<br>Interior; UNITED STATES BUREAU OF<br>RECLAMATION; BUREAU OF INDIAN<br>AFFAIRS,<br>　　　　　*Defendants-Appellees*,<br><br>STATE OF ARIZONA; CENTRAL<br>ARIZONA WATER CONSERVATION<br>DISTRICT; ARIZONA POWER<br>AUTHORITY; SALT RIVER PROJECT<br>AGRICULTURAL IMPROVEMENT AND<br>POWER DISTRICT; SALT RIVER<br>VALLEY WATER USERS'<br>ASSOCIATION; IMPERIAL IRRIGATION<br>DISTRICT; METROPOLITAN WATER<br>DISTRICT OF SOUTHERN<br>CALIFORNIA; COACHELLA VALLEY<br>WATER DISTRICT; STATE OF<br>NEVADA; COLORADO RIVER<br>COMMISSION OF NEVADA; | No. 14-16864<br><br>D.C. No.<br>3:03-cv-00507-<br>GMS<br><br><br>OPINION |

---

[*] We substitute Ryan Zinke for predecessor Sally Jewell as a Defendant-Appellee pursuant to Fed. R. App. P. 43(c)(2).

SOUTHERN NEVADA WATER
AUTHORITY; STATE OF COLORADO,
   *Intervenor-Defendants-Appellees.*

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, District Judge, Presiding

Argued and Submitted February 14, 2017
San Francisco, California

Filed December 4, 2017

Before:  Ronald M. Gould and Marsha S. Berzon, Circuit
Judges, and Marvin J. Garbis,[**] District Judge.

Opinion by Judge Berzon

---

   [**] The Honorable Marvin J. Garbis, United States District Judge for
the District of Maryland, sitting by designation.

## SUMMARY[***]

### Standing / Sovereign Immunity / Water Rights

The panel affirmed in part, and reversed in part, the district court's dismissal of the Navajo Nation's Second Amended Complaint, and denial of the Nation's Fed. R. Civ. P. 60(b) motion for relief, in their challenge to the Department of the Interior's published Guidelines in 2001 and 2008 clarifying how it would make "surplus" and "shortage" determinations for delivery to Western states of the waters of the Colorado River.

The Nation is a federally recognized tribe, and the United States is trustee of the Nation's tribal lands. The Navajo Reservation covers parts of Arizona, New Mexico, and Utah, and lies almost entirely within the drainage basin of the Colorado River.

The Department of the Interior, through the Bureau of Reclamation, operates dams and reservoirs that control the flow of the Colorado's waters.

The panel affirmed the district court's dismissal of the Nation's National Environmental Policy Act claims for lack of Article III standing.  The panel held that, although the district court considered the Nation's interests in adequate water too narrowly, it agreed with the district court that the Nation failed to show it "reasonably probable" that the new

---

[***] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Guidelines threatened either the Nation's unadjudicated water rights or its practical water needs.

The panel held that the Nation's breach of trust claim was not barred by sovereign immunity, and remanded to the district court to consider the claim on its merits. The panel held that the broad waiver of sovereign immunity found in § 702 of the Administrative Procedure Act ("APA") waived sovereign immunity for all non-monetary claims, and § 704 of the APA's final agency action requirement constrained only actions brought under the APA. The panel concluded that the Nation's breach of trust claim sought relief other than money damages, and the waiver of sovereign immunity in § 702 applied squarely to the claim.

Because the panel reversed the district court's dismissal of the Nation's breach of trust claim, the panel held that the Nation's appeal from the district court's denial of its Rule 60(b) motion was moot to the extent it sought to amend its complaint to plead additional or alternative waivers of sovereign immunity. The panel held that the Nation was not entitled to relief under Rule 60(b) to amend its pleadings for its National Environmental Policy Act allegations.

---

## COUNSEL

Scott B. McElroy (argued) and Alice E. Walker, McElroy Meyer Walker & Condon P.C., Boulder, Colorado; M. Kathryn Hoover and Stanley M. Pollack, Navajo Nation Department of Justice, Window Rock, Arizona; for Plaintiff-Appellant.

Elizabeth Ann Peterson (argued), Edward S. Geldermann, Ellen J. Durkee, and William B. Lazarus, Attorneys; John C. Cruden, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Scott Bergstrom and Robert F. Snow, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; for Defendants-Appellees.

L. William Staudenmaier III (argued), Phoenix, Arizona, for Intervenor-Defendants-Appellees.

Michael J. Pearce, Maguire Pearce & Storey PLLC, Phoenix, Arizona; Kelly Brown and Kenneth C. Slowinski, Chief Counsel, Arizona Department of Water Resources, Phoenix, Arizona; for Intervenor-Defendants-Appellees State of Arizona and Arizona Power Authority.

John B. Weldon, Jr. and Lisa M. McKnight, Salmon Lewis & Weldon PLC, Phoenix, Arizona; for Intervenor-Defendants-Appellees Salt River Project Agricultural Improvement and Power District and Salt River Valley Water Users' Association.

Stuart Somach and Robert Hoffman, Somach Simmons & Dunn, Sacramento, California; for for Intervenor-Defendant-Appellee Central Arizona Water Conservation District.

Lauren J. Caster, Special Deputy Counsel, and Gregory L. Adams, Fennermore Craig P.C., Phoenix, Arizona; Jennifer T. Crandell, Special Counsel Attorney General; Adam Paul Laxalt, Attorney General; Office of the Nevada Attorney General; for Intervenor-Defendant-Appellee State of Nevada; Colorado River Commission of Nevada; Southern Nevada Water Authority.

Adam C. Kear, Chief Deputy General Counsel; Joseph A. Venderhorst, Assistant General Counsel; Marcia Scully, General Counsel; The Metropolitan Water District of Southern California, Los Angeles, California; for for Intervenor-Defendant-Appellee Metropolitan Water District of Southern California.

Steven B. Abbott, Redwine and Sherrill, Riverside, California, for Intervenor-Defendant-Appellee Coachella Valley Water District.

Joanna M. Smith Hoff, Assistant Counsel, Imperial Irrigation District, Imperial, California; Charles T. Dumars, Law & Resource Planning Associates P.C., Albuquerque, New Mexico; for Intervenor-Defendant-Appellee Imperial Irrigation District.

Steven G. Martin and Steven M. Anderson, Best Best & Krieger LLP, Riverside, California, for Intervenor-Defendants-Appellees Coachella Valley Water District and The Metropolitan Water District of Southern California.

Shanti Rosset, Assistant Attorney General; Karen M. Kwon, First Assistant Attorney General; Cynthia Coffman, Attorney General; Attorney General's Office, Denver, Colorado; for Intervenor-Defendant-Appellee State of Colorado.

**OPINION**

BERZON, Circuit Judge:

The Department of the Interior ("Interior" or "the Secretary") oversees the control, storage, and delivery to the Western states of the waters of the Colorado River.  In most years, each state in the Colorado River Basin receives a fixed amount of water from the river; in "surplus" and "shortage" years, that amount changes.  In the face of unprecedented drought and ever-increasing demand for water, Interior published guidelines in 2001 and 2008 to clarify how it would make these "surplus" and "shortage" determinations from year to year.  This case concerns challenges to those guidelines by the Navajo Nation ("Nation"), a federally recognized Indian tribe.

The Nation occupies vast reservation lands along the Colorado River but has no judicially decreed right to its waters.  Aggrieved by its lack of enforceable rights to Colorado River water, the Nation filed suit to challenge the surplus and shortage guidelines, alleging principally that Interior neglected to consider the guidelines' impact on its potential, but as-yet unadjudicated, water rights in the Colorado River and so violated the National Environmental Policy Act ("NEPA").  The Nation also charged Interior with more broadly breaching the trust duties the government owes the Nation by failing to account for or safeguard the tribe's interests in and rights to water in the river.  The district court rejected all of the Nation's challenges, which are now raised anew here.

# I. BACKGROUND

## A. The Navajo Nation

The Nation is a federally recognized Indian tribe whose reservation lands sprawl over 13 million acres in the American Southwest.[1]   The Navajo Reservation ("Reservation"), the largest Indian reservation in the United States, was established by treaty in 1868 and grew piecemeal between 1868 and 1934, as lands were added to it by treaty, executive order, and statute.  The Reservation covers parts of Arizona, New Mexico, and Utah, and lies almost entirely within the drainage basin of the Colorado River,[2] which demarcates much of the Reservation's western boundary. Aside from the federal government, the Nation is the largest riparian landowner along the Colorado.

The United States is trustee of the Nation's tribal lands and resources.  *United States v. Mitchell*, 463 U.S. 206, 225 (1983).   The Nation's claims in this action arise either directly or derivatively from the alleged breach of fiduciary responsibilities created by this trust relationship.

---

[1] These facts are drawn from the complaint, which we accept as true for purposes of reviewing a motion to dismiss for lack of subject-matter jurisdiction. *See Courthouse News Serv. v. Planet*, 750 F.3d 776, 780 (9th Cir. 2014).

[2] A river "drains" the surface water that flows into it; a "drainage basin" is the whole tract of land "drained by a river and its tributaries." WEBSTER'S THIRD NEW INT'L DICTIONARY 182, 685 (1971).

## B. The Law of the River

The Colorado River begins in the mountains of Colorado and flows nearly 1,300 miles to the Sea of Cortez, adjacent to the Sonoran Desert in Mexico, draining an area amounting to almost one-twelfth of the continental United States. *Arizona v. California*, 373 U.S. 546, 552 (1963). "Much of this large basin is so arid that it is, as it always has been, largely dependent upon managed use of the waters of the Colorado River System to make it productive and inhabitable." *Id.*

Because of the Colorado's importance to the West, river water is pervasively managed, regulated, and contested. Interior, through the Bureau of Reclamation, operates large dams and reservoirs that control the flow of the Colorado's waters. Additionally, federal statutory law and regulations, Supreme Court decrees, interstate compacts, state and federal common law, and treaties foreign and domestic affect the allocation and management of the River's waters. This byzantine legal regime is known as "The Law of the River," the relevant portions of which we summarize below.

### i.   The 1922 Compact[3]

In 1922, seven states entered into an interstate compact to govern the gross allocation of water from the Colorado River. The states wanted to assure that the Colorado became a

---

[3] The Court may take judicial notice of compacts, statutes, and regulations not included in the plaintiff's complaint. *See, e.g.*, *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California*, 547 F.3d 962, 968 n.4 (9th Cir. 2008) (noticing tribal-state compacts); *United States v. Woods*, 335 F.3d 993, 1001 (9th Cir. 2003) (holding it was proper for the district court to notice published agency regulations).

regular, dependable source of water; they recognized that doing so would require a regional or national solution.[4]

The Colorado River Compact ("1922 Compact") entered into by the affected states divided the river in two at Lee Ferry, Arizona. 1922 Compact art. II, *reprinted in* 70 Cong. Rec. 324 (Dec. 10, 1928). The "Upper Basin" States[5] (Colorado, New Mexico, Utah, and Wyoming) and the "Lower Basin" States (Arizona, California, and Nevada) would each be entitled to 7.5 million acre-feet per year ("mafy") of water.[6] *Id.* arts. II–III. This suit concerns water in the Lower Basin only. The Compact stated that it did not establish, alter, or impair any present perfected rights within the States, *id.* art VIII, nor "affect[] the obligations of the United States of America to Indian tribes," *id.* art VII. Commissioners from each state signed the compact, but it became effective under its terms only if ratified by Congress and the legislature of each signatory state. *Id.* art XI.

---

[4] *See Arizona v. California*, 373 U.S. at 554. Fears of over-appropriation by California played a role in the compact as well. *Id.* at 556.

[5] The Compact refers to states of the "Upper Division" and "Lower Division," *see id.* art. II. We instead follow the custom of the Supreme Court and refer to Arizona, California, and Nevada collectively as the "Lower Basin" states. *See, e.g.*, *Arizona v. California*, 373 U.S. at 558–59.

[6] An acre-foot is the volume of water that would cover an acre of land to the depth of one foot. WEBSTER'S THIRD NEW INT'L DICTIONARY 19.

*ii.   The Boulder Canyon Project Act*

In 1928, Congress addressed the management of the Colorado River through the Boulder Canyon Project Act, 43 U.S.C. § 617 *et seq.*  The Act conditionally approved the 1922 Compact and authorized the Secretary of the Interior to construct a massive dam at Boulder Canyon (now the Hoover Dam) and the attendant water delivery infrastructure (a reservoir, now Lake Mead, and delivery canals) to effectuate the allocations laid out in the 1922 Compact.  43 U.S.C. § 617.  The Act also allowed the Secretary to enter into contracts with users for the storage and delivery of water in the Project's reservoir.  *Id.* § 617d.

Most relevant for our purposes, the Act authorized the three Lower Basin States to negotiate a second compact divvying up their 7.5 mafy share of the Colorado's water—4.4 to California, 2.8 to Arizona, and 0.3 (i.e., 300,000 afy) to Nevada.  If entered into, this agreement would take effect once all three states had ratified the 1922 Compact.  *Id.* § 617c(a).

The Boulder Canyon Project Act became effective in 1929, after six of the seven states ratified the Compact, *see id.*, and California "irrevocably and unconditionally" covenanted to limit its consumption to 4.4 mafy.[7]  Arizona did not ratify the 1922 Compact, so the Lower Basin states never agreed to the second compact that would have

---

[7] *See* Act of March 4, 1929, *in* Statutes and Amendments to the California Codes, ch. 16, 48th Session (1929), at 38–39.  The Boulder Canyon Project Act lowered the 1922 Compact's ratification threshold: six states would suffice for ratification as long as California was among them and committed to a ceiling on its apportionment. *See* 43 U.S.C. § 617c(a).

apportioned the 7.5 mafy among the three states.  *See Arizona v. California*, 373 U.S. at 561–62.  The Secretary nonetheless entered into water contracts with the Lower Basin states.[8]  *Id.* at 562.

### iii.  *Arizona v. California*

Conflict over Lower Basin water continued between Arizona and California, coming to a boil in 1952 when Arizona sued California in an original action in the Supreme Court.  The United States intervened to represent federal interests, including the interests of 25 Indian tribes,[9] and other Basin States intervened as well.  Based on the report, findings, and recommended decree of a Special Master, *see Arizona v. California*, 373 U.S. at 551, the Court issued a decree clarifying each state's rights to Lower Basin water. *See Arizona v. California*, 376 U.S. 340 (1964) ("1964 Decree").

The 1964 Decree affirmed the provisional apportionments set out in the Boulder Canyon Project Act.  In years when the Secretary determined that 7.5 maf of water was available for release to the Lower Basin states, Nevada was entitled to 0.3 mafy; Arizona to 2.8 mafy; and California to the lion's share, 4.4 mafy.  1964 Decree art. II(B)(1), 376 U.S. at 342.  The Decree also parceled out the relative shares each Lower Basin

---

[8] While the Secretary contracted with Arizona and Nevada for their shares as laid out in the Boulder Canyon Project Act, 43 U.S.C. § 617c(a), it contracted to deliver 5.36 mafy to California, significantly more than the 4.4 mafy the Act contemplated.  *Arizona v. California*, 373 U.S. at 562.

[9] *See* Findings of Fact and Conclusions of Law Proposed by the United States of America, at 51, *Arizona v. California*, 373 U.S. 546 (1963) (No. 9, Original).

State would get in years in which, "as determined by the Secretary of the Interior," there was surplus water available.[10] 1964 Decree art. II(B)(2), 376 U.S. at 342.  If, instead, the Secretary determined in a given year that there was a *shortage* of water—less than 7.5 maf available in the Lower Basin—the Decree required the Bureau of Reclamation first to "provid[e] for satisfaction of present perfected rights in the order of their priority dates without regard to state lines." *Id.* art. II(B)(3), 376 U.S. at 342.  Then, "after consultation with the parties to major delivery contracts and such representatives as the respective States may designate, [the Secretary] may apportion the amount remaining available for consumptive use in such manner as is consistent with the Boulder Canyon Project Act," the Decree, and other applicable federal statutes. *Id.*

### iv.  Winters *rights*

In addition to partitioning the Colorado River waters among the three Lower Basin States, the 1964 Decree adjudicated the "*Winters* rights" of five Indian tribes. *Winters v. United States* held that "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976); *see also Winters v. United States*, 207 U.S. 564, 577 (1908).   The rights to this water—also called "reserved rights"—vest on the original date of withdrawal of the land

---

[10] California would receive 50% of the surplus, Arizona 46%, and Nevada 4%.  *See* 1964 Decree art. II(B)(2), 376 U.S. at 342.

and trump the rights of later appropriators.[11] *Cappaert*, 426 U.S. at 138. For Indian reservations, courts look to the treaties, executive orders, and statutes that set aside reservation land for the tribe in question.[12] *Winters* rights, unlike water rights gained through prior appropriation, are not lost through non-use. *Colville Confederated Tribes v. Walton*, 647 F.2d 42, 51 (9th Cir. 1981).

In *Arizona v. California*, the Supreme Court reaffirmed the vitality of the *Winters* doctrine, noting that "most of the [reservation] lands were of the desert kind—hot, scorching sands—and . . . water from the [Colorado] would be essential to the life of the Indian people and to the animals they hunted and the crops they raised." 373 U.S. at 599. The Decree awarded five tribes a right to Lower Basin water commensurate with the "practicably irrigable acreage" of each tribe's reservation. *Id.* at 600; 1964 Decree art. II(D), 376 U.S. at 343–45. Following the Special Master's lead, the Court declined to reach the claims of the other twenty tribes, including the Navajo Nation's. *See* 373 U.S. at 595. The Decree made clear, however, that it did not affect "[t]he rights or priorities, except as specific provision is made herein, of any Indian Reservation." *Id.* art. VIII(C), 376 U.S. at 352–53.

---

[11] Most water rights are acquired through appropriation. "Under the doctrine of prior appropriation, the first to divert and use water beneficially establishes a right to its continued use as long as the water is beneficially diverted." *Cappaert*, 426 U.S. at 139 n.5.

[12] *See, e.g.*, *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1265 (9th Cir. 2017) (dating the reservation of water from the Executive Orders that withdrew land for the tribe), *petition for cert. filed* (U.S. July 3, 2017) (No. 17-42).

The Supreme Court retained jurisdiction over the suit, 1964 Decree art. IX, 376 U.S. at 353, and, over the next few decades, announced several sequels to the original opinion. *See, e.g.*, *Arizona v. California*, 460 U.S. 605 (1983) (holding that res judicata barred re-opening the quantification of tribes' *Winters* rights); *Arizona v. California*, 530 U.S. 392 (2000) (holding that res judicata did *not* bar certain claims stemming from reservation boundary disputes); *Arizona v. California*, 547 U.S. 150 (2006) (consolidating prior decrees and implementing the water rights settlement concerning one Indian reservation).

## C. The Nation's Rights to Water in the Colorado River

Under the *Winters* doctrine, when setting aside lands for the Navajo Nation,  the United States impliedly reserved for the tribe "the waters without which their lands would [be] useless." *Arizona v. California*, 373 U.S. at 600.  As noted above, in the first iteration of *Arizona v. California*, the Special Master—and the Supreme Court—declined to reach the *Winters* claim put forward on behalf of the Nation.[13]  *Id.* at 595.  The Nation has in the last half-century repeatedly

---

[13] The Nation attempted to intervene in the suit on its own behalf, but the United States successfully opposed the motion.  *See* Response of the United States to the Motion on Behalf of the Navajo Tribe of Indians for Leave to Intervene, *Arizona v. California*, 373 U.S. 546 (1963) (No. 8, Original).  The claim filed on behalf of the Nation was for water in the Little Colorado River, a tributary of the Lower Colorado River.  *See* Findings of Fact and Conclusions of Law Proposed by the United States of America, *supra* note 9, at 58.  The Special Master, and the Court, declined to reach "particularly those [claims] relating to tributaries." *Arizona v. California*, 373 U.S. at 595.

asserted its right to water in the Lower Colorado,[14] but its potential water rights in the Lower Colorado have never been adjudicated or quantified.

## D. Implementing the Law of the River

The Secretary "is vested with considerable control over the apportionment of Colorado River waters," *Arizona v. California*, 373 U.S. at 593, and is generally responsible for the management and delivery of water from the Colorado pursuant to the Law of the River. Each state's water portion is dictated by the 1964 Decree, as is the allocation of surplus water; *Arizona v. California* accords discretion to the

---

[14] The Nation has been, and is, actively seeking additional water for the Reservation in several forums. The Nation's rights to water from the Little Colorado River, which flows through eastern Arizona and western New Mexico,

are being considered in an ongoing adjudication in Arizona state court. *See In re General Adjudication of All Rights to Use Water in Little Colorado River Sys. & Source*, No. CV 6417 (Ariz. Super. Ct., Apache Cty.). The Nation filed its claim in that adjudication in 1985. *See* Statement of Claimant The Navajo Nation, *In re General Adjudication*, No. CV 6417 (Nov. 27, 1985). The Nation may also receive an allocation of water from the Central Arizona Project ("CAP"), a major diversion canal in Arizona. In the Arizona Water Settlements Act of 2004, Pub. L. No. 108-451, 118 Stat. 3478, 3487 (2004), Congress directed the Secretary to set aside a specified amount of water from the CAP for distribution to the Navajo Nation—6,411 afy—should the Nation obtain rights through ongoing settlement negotiations. Congress conditioned the Nation's access to CAP water on approval of a water rights settlement by Congress before 2030. No such settlement has been reached to date.

Finally, the Nation requested that the Secretary of the Interior contract with the Nation for any of the water allocated to Arizona not committed to other users. The Secretary has not agreed to such a contract.

Secretary to apportion shortfalls in years of shortage, *see id.* at 593–94.  The 1964 Decree also commits the *determination* of surplus and shortage years to the Secretary.  *See* 1964 Decree, art. II(B)(2)–(3), 376 U.S. at 342.

The Colorado River Basin Project Act of 1968 required the Secretary to adopt criteria for the coordinated management of Lake Mead and Lake Powell, the reservoirs under the Secretary's management in the Lower Basin.  *See* 43 U.S.C. 1552(a)–(b).  These "Operating Criteria" for the coordinated management of the storage reservoirs in the Lower Basin help the Secretary determine whether to declare a shortage or surplus in any given year.  *See Colorado River Reservoirs: Coordinated Long-Range Operation*, 35 Fed. Reg. 8951 (June 10, 1970).  Before adopting the challenged guidelines, the Secretary made year-to-year determinations about declaring a shortage or surplus, relying on a varying combination of factors, including the year-end water levels in Lake Mead and Lake Powell, potential run-off conditions, and projected water demands.  *See Colorado River Interim Surplus Guidelines*, 66 Fed. Reg. 7772, 7774 (Jan. 25, 2001) (describing the factors the Secretary historically considered in making shortage and surplus declarations).  This ad hoc approach bred uncertainty about the possibility of surplus or shortage in any particular year, which grew untenable as demand for surplus water increased.  *Id.*.  To partially remedy this problem, the Secretary first decided to adopt more specific, objective criteria for making the annual determinations regarding surplus water.  *Id.*.  Guidelines for determining shortages came later.

### E. The Challenged Surplus and Shortage Guidelines

#### i. *Surplus Guidelines*

In 2001, the Secretary adopted the Colorado River Interim Surplus Guidelines ("Surplus Guidelines"). The Guidelines would "determine the conditions under which the Secretary would declare the availability of surplus water for use within" the Lower Basin states every year. *See Surplus Guidelines*, 66 Fed. Reg. at 7773. This declaration and allocation of a surplus, if there was one, were to be consistent with the 1964 Decree, the Colorado River Basin Project Act, and the Operating Criteria adopted pursuant to that Act. The Surplus Guidelines aimed to provide greater consistency and predictability in the Secretary's surplus declarations from year to year, in light of growing (and competing) demands for surplus water, and of California's continued diversion of more than its allotted 4.4 mafy share of Lower Basin water. *See id.* at 7773–74.

The Surplus Guidelines pegged the surplus declaration to the year-end water level in Lake Mead. *See id.* at 7775. If that water level equaled or exceeded the highest "tier,"[15] surplus water would be made available for all types of water uses. At or below the lowest "tier," a "Normal" or "Shortage" year would be declared and no surplus water would be released. At the middle tier, water would be released subject to use restrictions. *See id.* at 7780. These "interim" guidelines were set to expire in 2016. *See id.* at 7773–74, 7780–81.

---

[15] The three "tiers" correspond to three water surface elevations in Lake Mead. *Surplus Guidelines*, 66 Fed. Reg. at 7775.

Before adopting the Surplus Guidelines and issuing the Record of Decision, the Secretary published a draft environmental impact statement ("EIS") assessing the environmental impacts of four alternatives along with the "No-Action Alternative." *See Colorado River Interim Surplus Criteria, Notice of Availability of Draft EIS*, 65 Fed. Reg. 42,028, 42,029 (July 7, 2000). In December 2000, after receiving comments on its draft, the Secretary issued his final EIS ("FEIS"),[16] and one month later its Record of Decision, adopting the preferred alternative as the Surplus Guidelines. *See Surplus Guidelines*, 66 Fed. Reg. at 7772.

During the development of the EIS, the Secretary consulted with various Indian tribes whose lands or water resources lay in the Lower Basin. *See Final Environmental Impact Statement, Colorado River Interim Surplus Criteria* ("*Surplus Guidelines FEIS*"), Executive Summary, at 33, 44. Both the Navajo Nation and the Colorado River Basin Ten Tribes Partnership, of which the Nation is a member, submitted comments on the draft, calling it "fundamentally flawed" and "deeply and fatally flawed." *Surplus Guidelines FEIS* at B-187, B-196. The Nation complained that the proposed Surplus Guidelines did not account for its unquantified rights in the Lower Basin and fostered reliance by third parties on water to which it was, or would or could be, entitled. *Id.* at B-187 to B-190. The Ten Tribes objected to the lack of consideration of "Indian Trust Assets" and claimed that the Guidelines would generally frustrate the

---

[16] The full Surplus Guidelines FEIS is available at *Final Environmental Impact Statement: Colorado River Interim Surplus Criteria*, https://www.usbr.gov/lc/region/g4000/surplus/SURPLUS_FEIS.html (last updated Jan. 16, 2007).

development and protection of Indian water rights.  *Id.* at B-196 to B-215.

The Secretary responded that it was actively assisting tribes in obtaining their water rights, and it disagreed that the Guidelines would hamper or decrease incentives to develop Indian water rights in the Lower Basin.  *Id.* at B-189; B-203 to B-205.  "The Department does not believe this proposed action would preclude the Tribes or any entitlement holder from using their Colorado River entitlement. The interim surplus criteria will not alter the quantity or priority of Tribal entitlements."  *Id.* at B-204.

### ii.  *Shortage Guidelines*

The adoption of criteria for declarations of surplus water in the Colorado River coincided with the driest eight-year period in the recorded history of the River.  *See Colorado River Interim Guidelines for Lower Basin Shortages and Coordinated Operations for Lake Powell and Lake Mead* ("*Shortage Guidelines*"), 73 Fed. Reg. 19,873 (Apr. 11, 2008).  This historic drought, combined with increasing demand for river water, led the Secretary to implement guidelines for declaring shortages as well.  These guidelines would, like the Surplus Guidelines, offer greater predictability to mainstream Colorado water users regarding the supply of water in any given year.  The Shortage Guidelines also created mechanisms to encourage water banking and conservation that would provide greater year-to-year flexibility for the Secretary and water users.  *See Final Environmental Impact Statement, Shortage Guidelines*

("*Shortage Guidelines FEIS*"), Executive Summary, at ES-1 to ES-2.[17]

In 2008, the Secretary adopted the Shortage Guidelines and issued an accompanying Record of Decision. *See Shortage Guidelines*, 73 Fed. Reg. at 19,873. Like the Surplus Guidelines, the Shortage Guidelines linked the Secretary's declaration of a shortage to the level of water in Lake Mead. *See id.* at 19,874; *Shortage Guidelines FEIS*, Executive Summary, at ES-6. The Shortage Guidelines also implemented procedures for the coordinated operation of the Lake Mead and Lake Powell reservoirs in times of low water and shortage. *See Shortage Guidelines*, 73 Fed. Reg. at 19,874.

Beyond delineating when and how the Secretary would declare a shortage, the Shortage Guidelines also provided for the creation of "Intentionally Created Surplus" ("ICS") water. Water users could bank ICS water by either (i) conserving water through a variety of measures[18] or (ii) importing water from outside the Colorado ("non-system water") into the Lower Basin system. *Id.* at 19,877, 19,883, 19,887. The Guidelines also modified the Surplus Guidelines and extended them through 2026. *Id.* at 19,874.

---

[17] The full Shortage Guidelines FEIS is available at *Colorado River Interim Guidelines for Lower Basin Shortages and Coordinated Operations for Lakes Powell and Mead: Final Environmental Impact Statement*, https://www.usbr.gov/lc/region/programs/strategies/FEIS/#VolI (last updated Nov. 2007).

[18] These measures include fallowing fields, lining canals, desalinating non-river water, or implementing other "extraordinary conservation measures." *Id.* at 19,886.

In its comments on the draft EIS for the Shortage Guidelines, the Nation largely reiterated its objections to the Surplus Guidelines. *See Shortage Guidelines FEIS*, vol. IV, at IT-103 to IT-108. The FEIS included a discussion of Indian Trust Assets, including water rights.[19] *See id.* at 3–87. The Shortage Guidelines FEIS recognized that the Nation's unquantified *Winters* rights in the Lower Basin constituted an Indian Trust Asset, and noted that the Nation maintains that some portion of its *Winters* rights will need to be satisfied from the Colorado River. *Id.* at 3–96. Ultimately, however, the FEIS concluded that "[t]he proposed federal action would not result in any substantive effects on [Indian Trust Assets]." *See id.* at 5–12. To the Nation's concerns about possible injury to its unquantified water rights, the Secretary responded:

> No vested water right of any kind, quantified or unquantified, including federally reserved Indian rights to Colorado River water . . . will be altered as a result of any of the alternatives under consideration.
>
> To the extent that additional Tribal water rights are developed, established or quantified during the interim period of the proposed federal action, the United States will manage Colorado River facilities to deliver water

---

[19] The FEIS also considered potential impacts on tribal historic properties, tribal sacred sites, cultural resources, and biological resources. *See* Shortage Guidelines FEIS at 4-244 to 4-250.

consistent with such additional water rights, if
any, pursuant to federal law.

*See id.* at 4-249.

## II.  PROCEDURAL HISTORY

The Nation filed its initial complaint against the
Department of the Interior, the Secretary, the Bureau of
Reclamation, and the Bureau of Indian Affairs (collectively
"Federal Defendants") in March 2003.    The Nation
challenged under the Administrative Procedure Act ("APA"),
5 U.S.C. §§ 701–706, the 2001 Surplus Guidelines,[20] alleging
that the Secretary's failure adequately to consider and protect
the Nation's rights to, and interest in, water violated the
National Environmental Policy Act ("NEPA"), 42 U.S.C.
§ 4321 *et seq.*  The Nation further alleged that the United
States had breached its trust obligations to the Nation by
failing to consider or protect the Nation's water rights while
managing the Colorado River.

Various states and local government entities from
California, Arizona, Nevada, and Colorado intervened as
defendants.[21]   In October 2004, on the joint motion of the

---

[20] The Nation also challenged several other agency actions in its
complaint.  Only the Nation's First, Second, and Seventh Claims for relief
are at issue on appeal.

[21] From Arizona, the intervenors are the State of Arizona, Salt River
Project Agricultural Improvement and Power District, Salt River Water
Users' Association, and Central Arizona Water Conservation District;
from California, the Coachella Valley Water District, Imperial Irrigation
District, and the Metropolitan Water District of Southern California; and
from Nevada, the State of Nevada, Colorado River Commission of

parties, the district court stayed proceedings to allow for settlement negotiations.

In 2013, after almost a decade of unsuccessful settlement negotiations, the district court lifted the stay and the litigation started anew. The Nation twice amended its complaint, adding a challenge to the 2008 Shortage Guidelines, and the district court then granted motions to dismiss the Nation's Second Amended Complaint without prejudice, holding that the Nation lacked Article III standing to bring its NEPA claims and that its breach of trust claim was barred by sovereign immunity. At the hearing on the motions to dismiss, the district court inquired whether, if necessary, the Nation preferred a dismissal with leave to amend the complaint or a dismissal with prejudice. Notwithstanding the Nation's expressed preference for dismissal with leave to amend, the district court ultimately dismissed without leave to amend and without prejudice.

The Nation filed a Rule 60(b)(6) motion for relief from the final judgment, contending that because the relevant statute of limitations had run, the dismissal was effectively with prejudice. In the Nation's view, the district court should have re-opened the proceedings and granted it leave to further amend its complaint. The district court denied that motion. The Nation appeals both orders.

---

Nevada, and Southern Nevada Water Authority. The State of Colorado also intervened. The Arizona, California, and Nevada Intervenor-Defendants each filed separate answering briefs in this appeal, and Colorado joined the arguments set out in the Arizona and Nevada briefs.

## III.  STANDING

The district court dismissed the Nation's NEPA claims, holding that the alleged harm to the Nation's unquantified *Winters* rights was too speculative to confer standing. Although the district court considered the Nation's interests in adequate water too narrowly, we agree that the Nation failed to show it "reasonably probable" that the new Guidelines threatened its interests in obtaining adequate water.  *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969–70 (9th Cir. 2003).  Accordingly, we affirm the district court's dismissal of the NEPA claims.

### A.  Legal Standards

"[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To establish standing, a plaintiff must demonstrate "(1) a concrete and particularized injury that is 'actual or imminent, not conjectural or hypothetical'; (2) a causal connection between the injury and the defendant's challenged conduct; and (3) a likelihood that a favorable decision will redress that injury." *Pyramid Lake Paiute Tribe of Indians v. Nev. Dep't of Wildlife*, 724 F.3d 1181, 1187 (9th Cir. 2013) (quoting *Lujan*, 504 U.S. at 560–61).  Our review of standing is de novo. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1196–97 (9th Cir. 2004).

Where plaintiffs allege a "procedural injury"—that is, that the government's violation of a procedural requirement could impair some separate interest of the plaintiffs'—the "normal standards for . . . [the] immediacy" of injury are relaxed. *Lujan*, 504 U.S. at 572 n.7.  A plaintiff alleging procedural

harm can demonstrate injury in fact by showing (i) the agency violated certain procedural rules, (ii) those rules protect a concrete interest of the plaintiff, and (iii) it is "reasonably probable" that the challenged action threatens that concrete interest. *Citizens for Better Forestry*, 341 F.3d at 969–70.

The universe of interests procedurally protected by NEPA is broad: birdwatchers' and outdoorsmen's interests in their ability to "picnic, birdwatch, walk, and swim" in a particular area, *Cantrell v. City of Long Beach*, 241 F.3d 674, 681 (9th Cir. 2001); municipalities' interests "as varied as [their] responsibilities, powers, and assets," *City of Sausalito*, 386 F.3d at 1197, including harm to water resources, *see Churchill Cty. v. Babbitt*, 150 F.3d 1072, 1079 (9th Cir. 1998) (identifying harms such as "unknown changes to the underground water supply system, and reduced quality of local drinking water"); and, as here, Indian tribes' interest in assuring water is available on their reservation lands, *see Pyramid Lake Paiute*, 724 F.3d at 1188 ("[T]he Tribe's interest in maximizing flows to Pyramid Lake . . . is well established."). In any instance, though, the plaintiff must assert that the procedural violation could harm an interest specific to it, not an abstract interest in assuring that NEPA's procedural requirements for considering environmental impacts are followed. "A free-floating assertion of a procedural violation, without a concrete link to the interest protected by the procedural rules, does not constitute an injury in fact." *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 938 (9th Cir. 2005).

Although standing inquiries are inherently fact-specific, we have laid down some guideposts for determining whether it is "reasonably probable" that agency action threatens a plaintiff's interests. For one thing, the imminence inquiry is

"less demanding" for procedural harms.  *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001).  The challenged action need not immediately or directly cause the harm as a first-order effect.  "[T]hat the potential injury would be the result of a chain of events need not doom the standing claim." *Idaho Conservation League*, 956 F.2d at 1515.  "The relevant inquiry . . . is whether there is a 'reasonable probability' that the challenged procedural violation will harm the plaintiffs' concrete interests, not how many steps must occur before such harm occurs."  *Citizens for Better Forestry*, 341 F.3d at 975 (internal citations omitted).

Notwithstanding this relaxed standard, injury in fact requires a likelihood that the challenged action, if ultimately taken, would threaten a plaintiff's interests.  Where a plaintiff cannot "explain *in any way* how their [interests] may be affected" by agency action, it has not suffered an injury in fact.  *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n* ("*NIRS*"), 457 F.3d 941, 953 (9th Cir. 2006) (emphasis in original).  So, although a contingent "chain of events" can create a "reasonably probable" threat to a plaintiff's interests, a purely speculative sequence of occurrences will not meet this standard.  *See Bell v. Bonneville Power Admin.*, 340 F.3d 945, 951 (9th Cir. 2003).

## B.  Discussion

The Navajo Nation proposes for standing purposes that it has suffered two sorts of injuries.  The Guidelines, the Nation maintains, (1) "do[] not account for the unquantified *rights* of the Navajo Nation to the waters of the Lower Basin of the Colorado River" and (2) disregard "the unmet *needs* of the Navajo Nation and tribal members for water from the Lower Basin."  The two interests are distinct: the former arises out

of the Nation's potential reserved water rights under *Winters v. United States*, while the latter is a freestanding interest in an adequate water supply for the Nation that exists notwithstanding the lack of a decreed right to water. The district court's analysis focused only on the threat to the former interest. We consider each in turn.

### i. *Injury to the Nation's unquantified Winters rights*

The Nation's first alleged injury is to its as-yet-unquantified water rights under *Winters v. United States*, discussed in Part I.B.iv *supra*. The parties agree that the Nation may have unquantified *Winters* rights in some body of water.[22] Unquantified *Winters* rights in the Lower Basin are sufficiently concrete interests, the impairment of which—coupled with a procedural violation—gives rise to standing under NEPA. *See Citizens for Better Forestry*, 341 F.3d at 969–70. Indeed, interests in water less concrete than unquantified *Winters* rights have formed the basis for standing in the past. In *Laub v. U.S. Department of Interior*, 342 F.3d 1080, 1086 (9th Cir. 2003), for example, the "loss of affordable irrigation water" for farmers was a concrete

---

[22] When the United States intervened in *Arizona v. California* as trustee on behalf of the Nation (among other tribes), it presented evidence that the Nation had 8,490 acres of irrigable land on which to base a *Winters* claim. *See supra* notes 9 & 13 and accompanying text. This claim, however, was not adjudicated.

In the run-up to the present litigation, the tribe sent to the Bureau of Reclamation, during the consultation process on the Guidelines, a "water budget" of 76,732 afy that would need to be satisfied out of the Colorado River. The defendants contend that whatever water rights the Nation has under *Winters* might be satisfied from sources other than the Lower Basin of the Colorado.

interest sufficient for NEPA standing.  The precise scope and status of the Nation's possible *Winters* rights do not concern us; it is enough to establish standing to demonstrate that however those rights are delineated, they are threatened by the Guidelines.  But the Nation, we conclude, cannot so establish.

The Guidelines do not act directly upon the Nation's unquantified water rights, nor could they.[23]  So how could the Guidelines injure these rights?

The Nation alleges that the Secretary's actions will create a complex and difficult-to-reverse combination of third-party reliance and political inertia that will frustrate future attempts by the Nation to secure and enjoy its *Winters* rights.  In support of its allegation, the Nation posits the following chain of events: the Guidelines will "establish[] a system of reliance upon the Colorado River that ensures that entities other than the Navajo Nation will continue to rely on water supplies claimed by, reserved for, needed by, and potentially belonging to" it.  This reliance will make it "increasingly difficult" to satisfy the Nation's water rights from the Lower Basin, and will "limit the Navajo Nation's future options" for securing water, notwithstanding the seniority of its rights. Even with senior rights, "the complex process of bringing water to the Reservation in a contentious political climate" will cast a pall of uncertainty over the Nation's entitlement.

---

[23] "These Guidelines are not intended to, and do not . . . [a]ffect the rights of any holder of present perfected rights or reserved rights, which rights shall be satisfied within the apportionment of the State within which the use is made, and in the Lower Basin, in accordance with the Consolidated Decree." *See* Shortage Guidelines, 73 Fed. Reg. at 19,884.

Further developing its hypothetical scenario, the Nation argues that the United States will not be "inclined" to re-open the issue of water allocation in the Colorado, having forged a multi-state consensus for the Guidelines that "appeased the Lower Basin states." The Secretary's assurance that he will manage the Colorado consistent with any *Winters* rights quantified or obtained in the future "ignores political and practical realities," namely the "disincentive" for the United States to protect the Nation's water rights created by this system of reliance.

Critically, the Nation does not contend that the Guidelines *legally* impair any unquantified rights it has in Lower Basin water. It is common ground among all affected that *if* the Nation obtained decreed rights in the Lower Colorado Basin, that entitlement would trump all claims with a later priority date, "regardless of whether that water has been developed or relied upon by third parties with junior priority dates." Rather, the Nation's fear is that the Guidelines threaten to solidify a web of reliance interests and incentives that, as a *practical* matter, may prevent the Nation (or disincline the United States, as its trustee) from enjoying or pursuing those decreed rights.

Whether or not the Nation's realpolitik predictions have some truth to them, the posited injury to the Nation's unquantified *Winters* rights due to the Guidelines is too speculative to confer standing. The string of contingencies connecting the Guidelines to the frustration of the Nation's rights is not only long—not disqualifying in itself—but spindly, too. The Nation's allegations about the future development of reliance interests, and the government's intransigence in upsetting these interests in pursuit of the

Nation's unadjudicated water rights, are supported by "no facts, figures, or data." *See Bell*, 340 F.3d at 951.

For example, the Nation offers no support for its allegation that the United States will shirk its trust duties for fear of upsetting the water rights apple-cart. From the Secretary's stated attempt to avoid "destabilizing litigation," and to gain consensus among the Basin States for the challenged Guidelines, the Nation predicts that the United States would no longer be inclined to pursue water rights for the Nation if such actions necessitated a reallocation of rights or potentially upset the multi-state consensus underlying the Guidelines. But the tribe offers no actual support for this conjecture—no statements by any government officials, for example, and no pattern of such behavior in the past.[24]

Instead, the Nation attempts to shore up its allegations by invoking the "presum[ption] that general allegations embrace those specific facts that are necessary to support the claim" at the pleading stage. *Lujan*, 504 U.S. at 561 (citations omitted). "Conclusory allegations and unreasonable inferences, however, are insufficient to defeat a motion to dismiss." *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). "We do not . . . assume the truth of legal conclusions merely because they are cast in the form of factual allegations," and, most especially, where our jurisdiction is at stake, "[w]e cannot construe the complaint so liberally as to

---

[24] The complaint does not spell out this theory—that the United States will be disinclined to revisit water rights adjudications after the Guidelines are implemented—with any clarity. Nevertheless, we construe the complaint, favorably to the Nation, to embrace these allegations of injury. We note that at other junctures as well we have relied on the briefs on appeal to clarify the complaint, in compliance with our obligation to construe the complaint favorably to the plaintiff.

extend our jurisdiction beyond its constitutional limits." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

The Nation need not provide smoking-gun allegations of harm. But mere "speculation or 'subjective apprehension' about future harm [does not] support standing." *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000)). Instead, the Nation must plausibly allege that adoption of the Guidelines will in some fashion impede the ascertainment and declaration of the Nation's *Winters* rights. That it has not done.[25]

Absent more concrete allegations, the Nation cannot show that "harm to [its] concrete interests"—here, its possible *Winters* rights—"is reasonably probable," *Citizens for Better Forestry*, 341 F.3d at 975, and therefore that it has suffered the injury needed for standing.

---

[25] We also question whether the *Guidelines* create reliance interests over and above the pre-existing third-party reliance on the fully appropriated (or overappropriated) water of the Colorado River. The gross allocations of water in the 1964 Decree would seem primarily responsible for reliance on Lower Basin water. Unless the Nation can show that the Guidelines are creating *new* or *additional* reliance interests, it cannot demonstrate it to be reasonably probable that the Guidelines themselves pose any threat to the Nation's interests. *See Bell*, 340 F.3d at 951 (emphasizing that *the amendments* to the power delivery contracts, and not the contracts themselves, were the agency actions in question, and the amendments alone did not threaten the plaintiff's interests). *See also* Shortage Guidelines, 73 Fed. Reg. at 19,873 (describing the reliance of the West on the Colorado River for drinking water and agriculture).

ii.     *Injury to the Nation's generalized interest in Lower Basin water*

In addition to its unadjudicated *Winters* rights, the Nation articulated a different interest—a generalized interest in availability for its use of water in the Lower Basin—that, it alleged, the Guidelines could adversely affect.  We reaffirm that the interests upon which a NEPA plaintiff bases its standing need not be legal entitlements or substantive rights, and that an impairment as a practical matter of access to adequate water for use on one's land can qualify.  We hold, however, that the Nation again failed to trace a reasonably probable link between this second interest in water availability and the Guidelines, and so lacks standing under this theory of injury as well.

The complaint does adequately allege an interest in water availability aside from the tribe's *right* to water under *Winters*.  It states, for example, that the Guidelines will "adversely affect[] the water supply available to satisfy the Navajo Nation's rights *or to otherwise meet its needs*," (emphasis added) and that the Secretary's actions "fail to protect the Navajo Nation's rights to and *its interests in water* from the Lower Basin of the Colorado River" (emphasis added).  Peppered throughout the complaint as well are mentions of the Nation's "*needs* and rights" (emphasis added).  The Nation's repeated invocation of this distinct concrete interest—its generalized need for water from the Lower Basin, independent of any rights to it—offers an alternative basis upon which the Nation could have standing.

This interest, unlike unquantified *Winters* rights—which depend on the special status of the Nation's home as federally reserved land—is similar to that of any large landowner, or

municipality, or other potential Lower Basin water user. Indeed, the Nation is the largest riparian landowner along the Colorado River apart from the United States.

If such an interest in adequate water were, to a reasonable probability, potentially injured by a proposed federal action, the Nation would have standing to challenge NEPA compliance.  To support NEPA standing, the interest affected need not be "a substantive right sounding in property or contract," although it must be "distinct from the interest held by the public at large," *Cantrell*, 241 F.3d at 681 (citing *Lujan*, 504 U.S. at 562–63).  *Cantrell*, for example, held that birdwatchers had legally protected aesthetic interests in a bird habitat located on a closed naval station, even though they lacked a legal right of access to the base and viewed the birds from "areas in and around the station." *Id.* at 680.  Closer to this case, we regularly recognize concrete interests in access to water although the plaintiff has no decreed or contractual right to water.  *See Laub*, 342 F.3d at 1086 (the "loss of affordable irrigation water" for agricultural uses resulting from increased competition for irrigation water was sufficient injury to a cognizable interest for standing under NEPA); *Pyramid Lake Paiute*, 724 F.3d at 1187–88.

So the Nation's lack of decreed rights to Lower Basin water does not matter for standing.  Its interest in, and need for, the water is a cognizable interest—much like the farmers' interests in *Laub*—which, when threatened, may support standing under NEPA.

Our question, then, is whether the Nation has alleged a "reasonably probable" threat from the Guidelines to its interest in accessing Lower Basin water.  *Citizens for Better*

*Forestry*, 341 F.3d at 969.  If that interest is not imperiled by the Guidelines, the Nation has suffered no injury.

At the outset, we reject the Nation's reiterated argument that the Guidelines impair the Nation's interests in, and need for, Lower Basin water by establishing a system of third-party reliance that will make it harder to satisfy this need.  For the same reasons laid out in Part III.B.i with regard to the Nation's *Winters* rights, these allegations are too speculative to demonstrate injury to any of the Nation's interests.

But the Nation also alleges—albeit sparsely—another, different sort of injury to its generalized interest in Lower Basin water: there will simply be less of it available.  The Surplus Guidelines, the Nation maintains, will "adversely affect[] the water supply available to . . . meet [the Nation's] needs" by "allocat[ing] all of the surplus waters of the Colorado River" each year.  As for the Shortage Guidelines:

> The Nation's use of mainstream water in the Lower Basin will be charged against Arizona's Lower Basin apportionment, and Arizona is particularly vulnerable to water shortages, so the Nation reasonably fears that excessive ICS development[26] or an increased likelihood of a [declared] shortage will adversely affect its lands by *reducing the availability of local water supplies* needed to make them productive and livable.

(emphasis added) (internal citations omitted).

---

[26] For an explanation of ICS, *see supra* note 18 and accompanying text.

The constraints imposed by the Law of the River affect the plausibility of these averments concerning the Guidelines' possible impact on the water available to the Nation.  As noted above, the Nation's use of mainstream water "shall be charged to [Arizona's] apportionment."  1964 Decree art. II(B)(4), 376 U.S. at 343.  Arizona's apportionment, as set out in the 1922 Compact and reaffirmed in the 1964 Decree, is 2.8 mafy.  *Id.* art. II(B)(1), 376 U.S. at 342.  In times of shortage, the Colorado River Basin Project Act subordinates the water rights of Arizona's largest mainstream diverter, the Central Arizona Project ("CAP"), to those of California users.[27]  *See* 43 U.S.C. § 1521(b).  In flush years, the 1964 Decree grants Arizona 46% of the Lower Basin surplus water.  1964 Decree art. II(B)(2), 376 U.S. at 342.  So the broad contours of water allocation, and indeed many of the specific ones, are settled by existing law; the Guidelines merely shade in the details.

With those parameters in mind, we conclude that the Nation has not plausibly alleged that the Guidelines themselves—independently of the pre-existing water allotments—will impair the tribe's interest in the availability of Lower Basin water.  Construed as liberally as possible in the Nation's favor, the complaint does not explain why or how the Secretary's decisions on surplus and shortage declarations, or the Shortage Guidelines' rules on the banking of ICS water, threaten to reduce the amount of water available to the Nation.

Arizona's relative allotment of surplus water is fixed by the 1964 Decree.  *See id.*  The Guidelines do not make any

---

[27] The Central Arizona Project diverts more than 1.2 mafy of Arizona's 2.8 mafy allocation.  *Shortage Guidelines FEIS*, at 3–35.

allotments during times of surplus or shortage; they only ascertain the parameters for declaring whether there is a surplus or shortage. And it is another statutory provision, not the Guidelines, that triggers a statutory prioritization scheme that disadvantages Arizona. *See* 43 U.S.C. § 1521(b).

Given the disadvantage to Arizona in times of shortage, how the Secretary determines a shortage could, in theory, reduce the availability of local water supplies. For instance, if the Guidelines declared a shortage more often than would some other method of determining a shortage, part of Arizona's allotment (the CAP water) would be subordinated to California's needs, pursuant to the Colorado River Basin Project Act, more often than under the alternative approach, and less water would be available on the tribe's land. But the Nation's complaint does not anywhere allege that the Guidelines do, in fact, result in "an increased likelihood of a shortage" as compared to alternatives; it says only that "the likelihood of a shortage determination would be different under each of the alternatives in the guidelines proposed in the EIS." Fair enough. But it does not follow, as the Nation asserts, that the existence of an array of alternatives *itself* makes it "reasonably probable that unexplored effects threaten the Navajo Nation's interests."

The Nation's allegations regarding the ICS provisions of the Shortage Guidelines are equally unavailing. The Nation does not sketch out why ICS development—the banking of extra water saved or procured by water users—will be excessive, or how that development would reduce available water supplies for the Nation and thus threaten its interests in said water. We note that, under the Shortage Guidelines, states and users can only "bank" water by offsetting their water consumption in some other way. *See* 73 Fed. Reg. at

19,886.  Because the only water that can be banked this way is water saved by users *for the purpose of banking it*, the Nation's argument that the water would otherwise be available to meet the Nation's needs is difficult to understand.

Ultimately, the Nation has not shown why the Guidelines threaten injury to its interests in having water available to meet its needs, as compared to any available alternative. General references to the "risk of overlooking harmful effects"—without describing these effects—or to a "certain [e]ffect [on] the outcome of th[e] efforts" by the Nation to secure water—without any description of that effect—do not suffice.

The cases cited by the Nation in its discussion of the reasonably probable threat to its interests do not support its position to the contrary.  Rather, those cases reiterate the requirement that plaintiffs must identify how the challenged action threatens, to a reasonable probability, some separate interest belonging to them, and determined that the plaintiffs had done so.

*Douglas County v. Babbitt*, 48 F.3d 1495, 1501 (9th Cir. 1995), for example, concerned a county's allegation that its lands "could be threatened by how the adjoining federal lands [were] managed" with respect to pest, disease, and fire control.  We held the allegation sufficient to demonstrate standing because "a concrete interest . . . could [have been] harmed" by the challenged action.  *Churchill County*, 150 F.3d at 1079, similarly held that an increased risk of "fire hazards, airborne particles, [and] erosion," among other things, made it "reasonably probable" that a transfer of water rights threatened county land.  And in *Pyramid Lake Paiute Tribe*, 724 F.3d at 1188, it was common ground that the

transfer of water rights would "reduce[] flows to Pyramid Lake" and thereby injure the Tribe's interests in maximizing flows to the lake.  The plaintiffs in those cases thus affirmatively demonstrated that agency action would, to a reasonable probability, harm their interests.

We do not doubt the Nation's needs for water, or its skepticism that its needs and rights will be front and center as the Secretary and other stakeholders vie for water rights in the years to come.  "The United States historically has not been vigorous in litigating to establish or preserve Indian water rights."  William C. Canby, Jr., AMERICAN INDIAN LAW 504 (6th ed. 2015).[28]  More than half a century has passed since the Nation's *Winters* rights were first put forward for adjudication in *Arizona v. California*, and they go unquantified still.

In short, the challenged Guidelines do not, as far as the Nation has alleged, present a reasonable probability of threat to either the Nation's unadjudicated water rights or its practical water needs.  We therefore affirm the dismissal of the Nation's NEPA claims for lack of standing.

## IV.  SOVEREIGN IMMUNITY

The district court dismissed the Nation's breach of trust claim because the United States had not waived sovereign immunity for that claim.  The Nation alleged, as a breach of trust, Interior's failure "to determine the extent and quantity of water rights . . . or otherwise determine the amount of water which the [Nation] requires from the Lower Basin to

---

[28] "The tribes themselves can bring suit, but the cost of such litigation is frequently prohibitive."  *Id.* at 504–05.

meet the needs of the [Nation]."  The Nation's breach of trust claim is thus predicated not on an affirmative action but rather a failure to act.

The broad waiver of immunity found in § 702 of the APA did not apply, the district court held, because this Court's decisions construing the scope of § 702 limited its waiver to (i) challenges to "final agency action" and (ii) constitutional claims.  Because the Nation "fail[ed] to challenge any particular final agency action or bring a constitutional claim," the district court held, it could not avail itself of § 702's waiver.

We now review, and clarify, the scope of that waiver.

## A.  Legal Background

"The United States, as sovereign, is immune from suit save as it consents to be sued."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted).  As the contours of any such waiver define a court's authority to entertain a suit against the government, *id.*, each claim against the government must rest upon an applicable waiver of immunity.  We review whether sovereign immunity is waived de novo.  *Orff v. United States*, 358 F.3d 1137, 1142 (9th Cir. 2004).

Congress has enacted several broad waivers of the United States' sovereign immunity.[29]   The waiver here at issue appears in § 702 of the APA, which provides:

> [1] A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. [2] An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity . . . shall not be dismissed nor relief therein be denied on the ground that it is against the United States.

5 U.S.C. § 702.

Section 702, notably, does double duty, nestling a broad waiver of sovereign immunity (its second sentence) within an "omnibus judicial-review provision, which permits suit for violations of numerous statutes . . . that do not themselves include causes of action for judicial review." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1389 (2014).  We are mainly concerned here with the waiver, but, as will appear, the relationship between the § 702 cause of

---

[29] *See, e.g.*, Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) (waiving immunity as to certain torts committed by government employees acting in the scope of their employment); Tucker Act, 28 U.S.C. § 1491(a)(1) (waiving immunity as to contract claims and claims for damages not sounding in tort).

action and the § 702 waiver is key to making sense of our cases in this area.

The first sentence of § 702—the "omnibus" mechanism for review of agency action by courts—was the sum and substance of the judicial review provision of the APA as originally enacted in 1946. *See* Administrative Procedure Act, Pub. L. No. 79-404 § 10(a), 60 Stat. 237, 243 (1946) (codified as amended at 5 U.S.C. § 702). The second sentence—which waives sovereign immunity in cases "seeking relief other than money damages" for wrongs committed by agencies, their officers, and their employees, 5 U.S.C. § 702—was added in 1976 to clear up a morass of federal sovereign immunity jurisprudence, which at the time was "illogical," a "thankless" undertaking for federal courts, and "a mass of confusion . . . [and] confusion compounded." H.R. Rep. No. 94-1656, at 6–8 (1976) (internal citations omitted). In addition to ending "the injustice and inconsistency" begat by the doctrinal confusion, *id.* at 10, the amendment aimed to "broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment." *Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988). Just how broad those avenues are is our issue.

## B.  Ninth Circuit Law on § 702

A perceived conflict between two of our opinions construing § 702 lies at the root of this appeal. *Compare The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 524 (9th Cir. 1989) (holding that "[n]othing in the language of [§ 702] suggests that the waiver of sovereign immunity is limited to cases challenging . . . 'agency action'"), *with Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198 (9th

Cir. 1998) (noting § 702's "waiver of sovereign immunity contains several limitations," including § 704's requirement that the challenged conduct be "final agency action" or agency action otherwise reviewable by statute). A panel of this Court pronounced these two cases "directly contrary" to one another, and could find "no way to distinguish them," but, resolving the case before it on other grounds, declined to call the case en banc to harmonize the perceived intra-circuit conflict. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 809 (9th Cir. 2006); *see also EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070, 1086 (9th Cir. 2010) (noting the same "tension" between the same two decisions but again finding no need to resolve it). As we face the issue squarely, we delve into *Presbyterian Church* and *Gallo Cattle* in some detail.

*Presbyterian Church* held that § 702 waived sovereign immunity for the plaintiff churches' First and Fourth Amendment claims against the (now-defunct) Immigration and Naturalization Service (INS). 870 F.2d at 526 (9th Cir. 1989). The claims in *Presbyterian Church* arose from the dispatch of INS agents to attend, and furtively record, worship services at four Arizona churches as the agents were investigating the sanctuary movement, which was aiding refugees fleeing civil war in Central America. *Id.* at 520. The INS prevailed in district court on its argument that § 702 waived sovereign immunity only for claims challenging "agency action" as defined in 5 U.S.C. § 551(13). Under that definition, "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* at 524–25. The INS's argument was premised on the first sentence of § 702, which grants judicial review to "person[s] suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action."  5 U.S.C. § 702.

We reversed, interpreting the second sentence of § 702 as, on its face, "an unqualified waiver of sovereign immunity in actions seeking nonmonetary relief."  *Presbyterian Church*, 870 F.2d at 525.  *Presbyterian Church* noted that the second sentence of § 702 does not use the term "agency action."  *Id.* And the legislative history of the waiver provision, which *Presbyterian Church* surveyed at length, evinced Congress' intent to "eliminate the sovereign immunity defense in all equitable actions for specific relief" against the federal government.  *Id.* at 525 (quoting H.R. Rep. No. 94-1656, at 9 (1976)) (emphasis omitted).  Whatever restrictions were imposed by the first sentence's limitation of judicial review to "agency action" were absent in the broad waiver legislated three decades later, we concluded.  *Id.* at 525.  *Presbyterian Church* pronounced that reading in an "agency action" limitation to that second, independently enacted provision both "offend[ed] the plain meaning of the amendment" and flew in the face of the drafting history.  *Id.*

*Gallo Cattle Co. v. U.S. Department of Agriculture*, 159 F.3d 1194 (9th Cir. 1998), pointed in a different direction, stating that "the APA's waiver of sovereign immunity contains several limitations," including a proviso in § 704 that only "final agency action" and agency action otherwise reviewable by statute are subject to judicial review.[30]  *Id.* at 1198.  *Gallo Cattle* concerned a dairy

---

[30] Section 704 provides: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.  A preliminary, procedural, or

producer who sought review in federal district court of a denial by an administrative board of its petition for interim relief. *Id.* at 1195–96. Gallo Cattle proposed paying the monetary assessments it was challenging on First Amendment grounds into escrow, rather than to the dairy board, pending the outcome of its constitutional challenge. *Id.* The district court held that it lacked jurisdiction over the claim because the statute governing the dairy assessments allowed review only after the Secretary of Agriculture had decided the merits of Gallo's petition, *id.* at 1197–98, and this Court affirmed.

Relevant to our analysis, we rejected Gallo Cattle's alternative argument that the APA provided a source of jurisdiction, holding that there was no "final agency action" under § 704. *Id.* at 1198–99. The Court identified the final agency action requirement of § 704 as a "limitation[]" on § 702's waiver of sovereign immunity, *id.* at 1198, and thus a "jurisdictional" requirement of suit. *See id.* at 1199 (holding that the lack of final agency action meant § 704 "could not vest the district court with jurisdiction to review the order"); *id.* at 1200 (same).

How could there be this limitation, when recently we had said there was "no such limitation"? *Presbyterian Church*, 870 F.2d at 525. Notably—and inexplicably—*Gallo Cattle* did not cite or discuss *Presbyterian Church*. Still, notwithstanding the dictum in *Gros Ventre Tribe*, 469 F.3d at 809, that there is "no way to distinguish" these "directly contrary" holdings, a panel of this Court recently did just that.

---

intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704.

*Veterans for Common Sense v. Shinseki* ("*VCS I*"), 644 F.3d 845 (9th Cir. 2011), *opinion vacated on reh'g en banc*, 678 F.3d 1013 (9th Cir. 2012), untangled the *Gallo Cattle-Presbyterian Church* knot. *Gallo*'s claim for interim relief,[31] it noted, was brought directly under the APA—specifically, the first sentence of § 702, which grants judicial review to those people "'suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action.'" *VCS I*, 644 F.3d at 865–66 (quoting 5 U.S.C. § 702). APA claims, as outlined in the first sentence of § 702, are subject to "§ 704's limitation on what agency action is reviewable—meaning subject to 'judicial review' under the first sentence of § 702." *Id.* at 866. Claims not grounded in the APA, like the constitutional claims in *Presbyterian Church* and *VCS I*, "do[] not depend on the cause of action found in the first sentence of § 702" and thus § 704's limitation does not apply to them. *Id.* at 867. According to *VCS I*, then, the limitation on the APA's waiver of sovereign immunity discussed in *Gallo Cattle* is simply that a court is foreclosed by § 704 from entertaining claims *brought under the APA* seeking review of non-final agency action (and not otherwise permitted by law).[32] "[N]o such limitation," *Presbyterian Church*, 870 F.2d at 525, applies to other types of claims (like the constitutional claims in *Presbyterian Church*).

---

[31] Gallo appealed to the district court only from the Secretary's denial of interim relief—the escrowing of the disputed assessments. The Secretary had not yet passed on, and so Gallo did not appeal, the merits of its First Amendment challenge. *Gallo Cattle*, 159 F.3d at 1198.

[32] In addition to making reviewable final agency action, the APA permits suit to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706.

*VCS I* was vacated upon rehearing en banc, so its analysis does not stand as the law of the circuit.**[33]**  But we believe the panel opinion persuasively reconciled *Gallo Cattle* and *Presbyterian Church* and so follow its lead.

First, the text of the second sentence of § 702 contains no limitation to "final agency action," to APA cases, or to APA and constitutional cases.  We read statutes as written, subject to very limited exceptions, none of which apply here.**[34]**  As there is no basis for reading into the amendment to § 702 language that is not there, we should not do so.  And, as *VCS I* concluded, nothing in *Gallo Cattle* requires us to adopt an atextual reading of § 702, as *Gallo Cattle* concerned a cause of action under the APA.  We therefore hold, as did *VCS I*, that § 702 waives sovereign immunity for all non-monetary claims; § 704's final agency action requirement constrains only actions brought under the APA.

The district court concluded otherwise, viewing *Presbyterian Church* as an exception to § 704 for constitutional claims only.  By so holding, the district court took the wrong path.

What *Presbyterian Church* actually determined was that when Congress amended § 702 by adding its second sentence, it enacted an "unqualified" waiver of sovereign immunity in

---

**[33]** *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013 (9th Cir. 2012) (en banc).

**[34]** "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004).

"all actions seeking relief from official misconduct except for money damages." *Presbyterian Church*, 870 F.2d at 525. This Court has long so understood the opinion—that is, as holding that § 702 waives "whatever sovereign immunity the United States enjoyed from prospective relief" with respect to "any action for injunctive relief." *Cabrera v. Martin*, 973 F.2d 735, 741 (9th Cir. 1992) (citing *Presbyterian Church*, 870 F.2d at 524–25) (emphasis omitted); *see also Hill v. United States*, 571 F.2d 1098, 1102 (9th Cir. 1978) ("[Section 702] is cast as a blanket waiver of sovereign immunity as to a broad category of actions against the government"); *Clinton v. Babbitt*, 180 F.3d 1081, 1087 (9th Cir. 1999) (holding that § 702 flatly "expressly waived" immunity for non-statutory claims for "nonmonetary relief against the United States").

*Gallo Cattle* is fully consistent with this understanding of *Presbyterian Church*, and of § 702, as *Gallo Cattle* addressed a claim brought directly under the APA. Even if sovereign immunity is waived for claims not involving "final agency action," § 704's requirement that to proceed under the APA, agency action must be final or otherwise reviewable by statute is an independent element without which courts may not determine APA claims. Section 702, notably, expressly preserves the § 704 limitations, among many others, by providing that nothing in § 702 "affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702; *see also Darby v. Cisneros*, 509 U.S. 137, 153 (1993) (noting that the finality requirement for actions brought under the APA, 5 U.S.C. § 704, is undiminished by § 702's waiver of sovereign immunity).

Read this way, *Gallo Cattle* has much to say about the elements of the APA cause of action, and little to say about sovereign immunity.**[35]**  As noted, missing from *Gallo Cattle* is *any* discussion of *Presbyterian Church*.  This significant omission is further evidence that *Gallo Cattle* governs only in cases where, unlike *Presbyterian Church*, the APA supplies the cause of action.  For non-APA claims, "it is *Presbyterian Church* and not *Gallo Cattle* that controls." *VCS I*, 644 F.3d at 866.

Our conclusion—that the second sentence of § 702 waives sovereign immunity broadly for all causes of action that meet its terms, while § 704's "final agency action" limitation applies only to APA claims—is consistent with case law in almost all our sibling circuits.  In *Trudeau v. FTC*, for example, the D.C. Circuit rejected a government agency's argument that § 702's waiver is "restricted to conduct that falls within th[e] compass" of final agency action.  456 F.3d 178, 186 (D.C. Cir. 2006).  The court noted, as have we, that the language of the APA "provides no support" for a cramped reading of the waiver incorporating § 704's  final agency action requirement, and that the legislative history likewise offers no basis for that position.  *Id.* at 187.  Rather, both the statutory language and its history counsel a broad waiver of "any" and "all" immunity for non-monetary claims.  *Id.*

---

**[35]** We draw confidence from this court's varying characterizations of the issue in *Gallo Cattle*: whether the APA "vested [the court] with jurisdiction," 159 F.3d at 1196; the court "had jurisdiction to review" the denial of relief "pursuant to the judicial review provisions of the [APA]," *id.* at 1198; the order was "reviewable," *id.*; or the APA "vest[ed] the district court with jurisdiction to review the order," *id.* at 1199.  Only once does *Gallo Cattle* characterize the issue as one of sovereign immunity. *Id.* at 1198.

(internal citations omitted).    Other circuits are in near-unanimity.[36]

   In sum, pigeonholing *Presbyterian Church* as a case about constitutional claims alone, as the district court did, is not supported by the statute, the language of the case, or any of our case law interpreting the statute, before or after *Presbyterian Church*.  Instead, we read *Gallo Cattle* in light of its facts to be a case primarily about the justiciability of APA claims challenging non-final action.  This reading does not trench at all upon *Presbyterian Church* or our other cases recognizing that § 702 enacted a broad, unqualified waiver for all non-monetary claims for relief against federal

---

[36] *See Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 475–76 (8th Cir. 1988) (rejecting the argument that § 702's waiver "exists only to allow review of a final agency decision" in Indian trust claims and holding that it depends only "on the suit against the government being one for non-monetary relief"); *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 400 (3d Cir. 2012) ("Section 704 concerns whether a plaintiff has a cause of action under the APA that can survive a motion to dismiss under Rule 12(b)(6) but does not provide a basis for dismissal on grounds of sovereign immunity"); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("[T]he conditions of § 704 affect the right of action contained in the first sentence of § 702, but they do not limit the waiver of immunity in § 702's second sentence.") (citing *VCS I*, 644 F.3d at 866–68); *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013) (same); *Delano Farms Co. v. Cal. Table Grape Comm'n*, 655 F.3d 1337, 1344 (Fed. Cir. 2011) (same); *see also United States v. Mitchell*, 463 U.S. 206, 227 & n.32 (1983) (noting that Congress "enacted a general consent" in § 702 to claims for declaratory and injunctive relief in a case alleging breach of fiduciary duty regarding tribal timber resources).  The Fifth Circuit appears to be alone in holding to the contrary.  *See Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 489 (5th Cir. 2014) ("the plaintiff must identify some 'agency action' affecting" it as defined under 5 U.S.C. § 551(13) to avail itself of § 702's waiver).

agencies.  And, our reading best squares the holdings of *Presbyterian Church* and *Gallo Cattle* in light of the text of § 702, the legislative history of the provision, and the strong weight of authority in the federal courts.

### C.  The Nation's Breach of Trust Claims

Here, the Nation in its breach of trust claim against Interior seeks "relief other than money damages" for claims "that an agency or an officer or employee thereof acted or failed to act in an official capacity."  5 U.S.C. § 702.  The waiver of sovereign immunity in § 702 applies squarely to the Nation's breach of trust claim.

The district court expressed some tentative views on the merits of this claim but ultimately rested its dismissal squarely on the bar of sovereign immunity.  We therefore remand to the district court to consider fully the Nation's breach of trust claim in the first instance, after entertaining any request to amend the claim more fully to flesh it out.

### V.  RULE 60(B) RELIEF FROM JUDGMENT

After the district court entered judgment against the Nation, the Nation moved for relief under Federal Rule of Civil Procedure 60(b)(6), seeking to re-open the proceedings so that it could amend its pleadings.  Where none of Rule 60(b)'s five enumerated circumstances applies, its catch-all provision permits a court to grant relief for "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  The district court denied the motion because the Nation had failed to cure its pleading deficiencies in previous amendments, did not explain why its claims would be time-barred after dismissal without prejudice, and did not spell out with sufficient

specificity how it intended to amend its complaint. "We review the district court's denial of a Rule 60(b) motion for an abuse of discretion." *Delay v. Gordon*, 475 F.3d 1039, 1043 (9th Cir. 2007).

Because we reverse the district court's dismissal of the Nation's breach of trust claim, its appeal from the district court's denial of its 60(b) motion is moot to the extent the Nation sought to amend its complaint to plead additional or alternative waivers of sovereign immunity. *See Thompson v. Calderon*, 151 F.3d 918, 920 (9th Cir. 1998) (en banc). Our affirmance of the district court's dismissal of the Nation's NEPA claims, however, requires us to address this appeal insofar as the Nation sought to replead those claims.

A court should "freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), a policy "to be applied with extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). But "after final judgment has been entered, a Rule 15(a) motion may be considered only if the judgment is first reopened under Rule 59 or 60." *Lindauer v. Rogers*, 91 F.3d 1355, 1356 (9th Cir. 1996).

In contrast to the "freely give[n]" dispensation to amend in Rule 15, Rule 60(b) relief should be granted "sparingly" to avoid "manifest injustice" and "*only* where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993) (emphasis added). "Rule 60(b)(6) relief normally will not be granted unless the moving party is able to show both injury and that circumstances beyond its control prevented timely action to protect its interests." *Id.* After judgment,

then, "our policy of promoting the finality of judgments" somewhat displaces Rule 15's openhandedness. *Lindauer*, 91 F.3d at 1357.

Contrary to the district court, we do think the Nation sufficiently explained why the district court's dismissal of claims was effectively with prejudice—because the relevant statutes of limitations had run on those claims. *See* 28 U.S.C. § 2401(a) (six-year statute of limitations against the United States). Nonetheless, the district court did not abuse its discretion in denying the Nation relief from final judgment to allow leave to amend.

The Nation amended its complaint twice before the court dismissed its claims. Although the Nation argues that it amended its complaint each time for other reasons,[37] it had ample opportunity at those junctures to address the deficiencies in its pleading—deficiencies which, at least at the time the Second Amended Complaint was filed, the defendants had identified in their motions to dismiss. *See Premo v. Martin*, 119 F.3d 764, 772 (9th Cir. 1997); *Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir. 2001). The Nation also had time after filing its Second Amended Complaint, but before the court dismissed its claims, to seek further leave to amend. *See Premo*, 119 F.3d at 772 (noting the plaintiff's "ample opportunity to file an amended complaint with new allegations before the court issued its final judgment"). Based on the Nation's past failures to amend its complaints and its present failure specifically to identify how it would amend its pleading to overcome its standing problems, the

---

[37] The Nation first amended its complaint to bring it up to date after a nearly decade-long stay pending unsuccessful settlement talks. It later amended the complaint to voluntarily strike one of its claims.

district court reasonably concluded that the Nation had not negated futility.

Given the Nation's opportunities (and failures) to amend, the district court acted within its discretion in refusing post-judgment leave to amend.

## VI.  CONCLUSION

The Nation lacks Article III standing for its NEPA claims and is not entitled to relief from judgment under Rule 60(b) to amend its pleadings as to those allegations.  The Nation's breach of trust claim, however, is not barred by sovereign immunity.  As the dismissal of that claim on sovereign immunity grounds was unwarranted, we remand to the district court to consider the claim on its merits, after entertaining any request to amend it.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**