**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NAVAJO NATION,
　　　　　*Plaintiff-Appellant*,

　　　　　v.

U.S. DEPARTMENT OF THE INTERIOR;
DEB HAALAND, Secretary of the
Interior; UNITED STATES BUREAU OF
RECLAMATION; BUREAU OF INDIAN
AFFAIRS,
　　　　　*Defendants-Appellees*,

STATE OF ARIZONA; CENTRAL
ARIZONA WATER CONSERVATION
DISTRICT; ARIZONA POWER
AUTHORITY; SALT RIVER PROJECT
AGRICULTURAL IMPROVEMENT AND
POWER DISTRICT; SALT RIVER
VALLEY WATER USERS'
ASSOCIATION; IMPERIAL IRRIGATION
DISTRICT; METROPOLITAN WATER
DISTRICT OF SOUTHERN CALIFORNIA;
COACHELLA VALLEY WATER
DISTRICT; STATE OF NEVADA;
COLORADO RIVER COMMISSION OF
NEVADA; SOUTHERN NEVADA
WATER AUTHORITY; STATE OF
COLORADO,
　　*Intervenor-Defendants-Appellees*.

No. 19-17088

D.C. No.
3:03-cv-00507-
GMS

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
G. Murray Snow, Chief District Judge, Presiding

Argued and Submitted October 16, 2020
Pasadena, California

Filed April 28, 2021
Amended February 17, 2022

Before:  Ronald M. Gould, Marsha S. Berzon, and
Kenneth K. Lee, Circuit Judges.

Order;
Opinion by Judge Gould;
Concurrence by Judge Lee

## SUMMARY[*]

### Water Rights / Tribal Matters

The panel reversed the district court's dismissal, based on lack of jurisdiction, of Navajo Nation's breach of trust claim alleging that Federal Appellees failed to consider the Nation's as-yet-undetermined water rights in managing the Colorado River.

The district court held that any attempt by the Nation to amend its complaint was futile because the district court lacked jurisdiction to decide the breach of trust claim due to

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the Supreme Court reserving jurisdiction over allocation of rights to the Colorado River in *Arizona v. California (Arizona I)*, 373 U.S. 546 (1963) (opinion); *accord Arizona v. California (1964 Decree)*, 376 U.S. 340, 353 (1964) (decree).

The panel held that the district court erred in dismissing the complaint because the amendment was not futile. Although the Supreme Court retained original jurisdiction over water rights claims to the Colorado River in *Arizona I*, the Nation's complaint did not seek a judicial quantification of rights to the River, and therefore, the panel need not decide whether the Supreme Court's retained jurisdiction was exclusive. The panel concluded it had jurisdiction to consider the Nation's claim, and the district court erred in holding otherwise.

The panel held, contrary to the Intervenors' arguments on appeal, that the Nation's claim was not barred by res judicata, despite the federal government's representation of the Nation in *Arizona I*. The panel held that the Nation, here, asserted a different claim than the water rights claim the federal government could have asserted on the Nation's behalf in *Arizona I*. The federal government's fiduciary duty to the Nation was never at issue in *Arizona I*, and no final judgment was ever entered on the merits of any question concerning that subject.

Finally, the panel held that the district court erred in denying the Nation's motion to amend and in dismissing the Nation's complaint, because the complaint properly stated a breach of trust claim premised on the Nation's treaties with the United States and the Nation's federally reserved *Winters* rights, especially when considered along with the Federal Appellees' pervasive control over the Colorado River. At

this early stage of the litigation, the panel declined to address whether the Nation's *Winters* rights included rights to the mainstream of the Colorado River or to any other specific water resources. The panel remanded to the district court with instructions to permit the Nation to amend its complaint.

Judge Lee concurred. He wrote separately to emphasize that the Nation's proposed injunctive relief should not and did not implicate the Supreme Court's retained jurisdiction in the *1964 Decree*.

**COUNSEL**

M. Kathryn Hoover (argued), Sacks Tierney P.A., Scottsdale, Arizona; Stanley M. Pollack, Navajo Nation Department of Justice, Window Rock, Arizona; Alice E. Walker and Gregg H. DeBie, Meyer Walker Condon & Walker P.C., Boulder, Colorado; for Plaintiff-Appellant.

John L. Smeltzer (argued), Mary Gabrielle Sprague, and Thomas Snodgrass, Attorneys; Todd Kim, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Robert Snow and Sarah Foley, Attorneys, Solicitor's Office, United States Department of the Interior, Washington, D.C.; for Defendants-Appellees.

Rita P. Maguire (argued), Rita P. Maguire PLLC, Phoenix, Arizona; Steven B. Abbott, Redwine and Sherrill LLP, Riverside, California; Kenneth C. Slowinski and Jennifer Heim, Arizona Department of Water Resources, Phoenix, Arizona; Marcia Scully and Catherine M. Stites, Metropolitan Water District of Southern California, Los

Angeles, California; Charles T. DuMars, Law & Resource Planning Associates P.C., Albuquerque, New Mexico; John B. Weldon Jr. and Lisa M. McKnight, Salmon Lewis & Weldon P.L.C., Phoenix, Arizona; Stuart L. Somach and Robert B. Hoffman, Somach Simmons & Dunn APC, Sacramento, California; Jay M. Johnson, Central Arizona Water Conservation District, Phoenix, Arizona; Aaron Ford, Attorney General; Christine Guerci-Nyhus, Special Counsel to the Colorado River Commission of Nevada; State of Nevada and Colorado River Commission of Nevada, Las Vegas, Nevada; Gregory J. Walch, General Counsel, Southern Nevada Water Authority, Las Vegas, Nevada; Lauren J. Caster and Bradley J. Pew, Fennemore Craig P.C., Phoenix, Arizona; Philip J Weiser, Attorney General; A. Lain Leoniak, First Assistant Attorney General; Office of the Attorney General, Denver, Colorado; for Intervenor-Defendants-Appellees.

Monte Tyler Mills, Associate Professor and Director, Margery Hunter Brown Indian Law Clinic, Alexander Blewett III School of Law, University of Montana, Missoula, Montana, for Amici Curiae Law Professors.

David L. Gover, Joe M. Tenorio, and Matthew Campbell, Native American Rights Fund, Boulder, Colorado; Daniel D. Lewerenz, Native American Rights Fund, Washington, D.C.; Derrick Beetso, National Congress of American Indians, Washington, D.C.; for Amicus Curiae NCAI Fund.

**ORDER**

The opinion in the above-captioned matter filed on April 28, 2021, and published at 996 F.3d 623, is amended as follows:

At 996 F.3d at 629, delete <The BCPA also authorized construction of the Central Arizona Project (CAP), which consists of an extensive canal system that diverts water from Lake Havasu to municipalities, irrigation districts, and Indian tribes in central Arizona. *See* 43 U.S.C. § 1521.>

At 996 F.3d at 641, replace <The BCPA requires the United States and all Colorado River users to "observe and be subject to and controlled by" the 1922 Compact, which apportioned the Colorado River's waters among the Lower Basin states.> with <The BCPA, which requires the United States and all Colorado River users to "observe and be subject to and controlled by" the 1922 Compact, apportioned the Colorado River's waters among the Lower Basin states.>

The panel has voted to deny Intervenor-Appellees' petition for rehearing en banc (Dkt. 61), and to deny Defendant-Appellees' petition for rehearing en banc (Dkt. 62). The full court has been advised of the petitions for rehearing en banc and no judge has requested a vote on whether to rehear either matter en banc. Fed. R. App. P. 35. The petitions for rehearing en banc are **DENIED**. No future petitions will be entertained.

**OPINION**

GOULD, Circuit Judge:

In 2003, the Navajo Nation (the Nation) sued the Department of the Interior (Interior), the Secretary of the Interior (the Secretary), the Bureau of Reclamation, and the Bureau of Indian Affairs (collectively, the Federal Appellees), bringing claims under the National Environmental Policy Act (NEPA) and a breach of trust claim for failure to consider the Nation's as-yet-undetermined water rights in managing the Colorado River. Several parties, including Arizona, Nevada, and various state water, irrigation, and agricultural districts and authorities (collectively, the Intervenors), intervened to protect their interests in the Colorado's waters. In a prior appeal, we held that while the Nation lacked Article III standing to bring its NEPA claims, its breach of trust claim was not barred by sovereign immunity, and we remanded to the district court. *Navajo Nation v. Dep't of Interior* (*Navajo I*), 876 F.3d 1144, 1174 (9th Cir. 2017). After re-considering the breach of trust claim, the district court dismissed the Nation's complaint because of its view that any attempt to amend the complaint was futile. The district court held that it lacked jurisdiction to decide the claim because the Supreme Court reserved jurisdiction over allocation of rights to the Colorado River in *Arizona v. California* (*Arizona I*), 373 U.S. 546 (1963) (opinion); *accord Arizona v. California* (*1964 Decree*), 376 U.S. 340, 353 (1964) (decree). The district court also held that the Nation did not identify a specific treaty, statute, or regulation that imposed an enforceable trust duty on the federal government that could be vindicated in federal court. The Nation appealed.

We conclude that the district court erred in dismissing the complaint because, in contrast to the district court's

determination, the amendment was not futile. Although the Supreme Court retained original jurisdiction over water rights claims to the Colorado River in *Arizona I*, the Nation's complaint does not seek a judicial quantification of rights to the River, so we need not decide whether the Supreme Court's retained jurisdiction is exclusive. And contrary to the Intervenors' arguments on appeal, the Nation's claim is not barred by *res judicata*, despite the federal government's representation of the Nation in *Arizona I*. Finally, the district court erred in denying the Nation's motion to amend and in dismissing the Nation's complaint, because the complaint properly stated a breach of trust claim premised on the Nation's treaties with the United States and the Nation's federally reserved *Winters* rights, especially when considered along with the Federal Appellees' pervasive control over the Colorado River. We remand to the district court with instructions to permit the Nation to amend its complaint.

# I

The Nation is a federally recognized Indian tribe that has signed two treaties with the United States. In ratifying the first treaty in 1849, the United States placed the Navajo people "under the exclusive jurisdiction and protection of the . . . United States," providing "that they are now, and will forever remain, under the aforesaid jurisdiction and protection." Treaty with the Navaho, 1849 art. I (Sep. 9, 1849), 9 Stat. 974. The Navajo Reservation (the "Reservation") was established as the "permanent home" of the Nation by the 1868 Treaty between the United States of America and the Navajo Tribe of Indians, 1868 art. XIII (June 1, 1868), 15 Stat. 667 (1868 Treaty). The Reservation was later expanded by executive orders and acts of Congress.

The Reservation sprawls across Arizona, New Mexico, and Utah, and lies almost entirely within the drainage basin of the Colorado River.  The Colorado River flows along and defines a significant part of the Reservation's western border.  Because much of the land in the Colorado River drainage basin is arid, competition for water from the Colorado River and its tributaries is fierce.

To resolve disputes arising from water scarcity, rights to the Colorado River's waters are allocated through a series of federal treaties, statutes, regulations, and common law rulings; Supreme Court decrees; and interstate compacts. Collectively, this legal regime is known as the "Law of the River."

## A

The Law of the River begins with the 1922 Colorado River Compact (1922 Compact), which split the Colorado River water equally between two groups of states: the "Upper Basin" states, consisting of Colorado, New Mexico, Utah, and Wyoming, and the "Lower Basin" states: Arizona, California, and Nevada.  1922 Compact art. II, *reprinted in* 70 Cong. Rec. 324 (Dec. 10, 1928).  Each group collectively received 7.5 million acre-feet per year (mafy) of water.  *Id*. art. III.  The 1922 Compact did not, however, apportion the 7.5 mafy *among* the individual states in either the Upper or Lower Basin.  *See id*. art. VIII.  Nor did it "affect[] the obligations of the United States of America to Indian tribes." *Id*. art. VII.

Six years later, Congress conditionally approved the 1922 Compact through the Boulder Canyon Project Act (BCPA).  43 U.S.C. § 617 *et seq*.  The BCPA allowed Interior to construct the Hoover Dam and a reservoir at Lake Mead.  *See id*. § 617.  It empowered the Secretary to contract

for the storage and delivery of water in Lake Mead. *See id*. Finally, it authorized the Lower Basin States to negotiate a second compact dividing their 7.5 mafy share: 4.4 mafy to California, 2.8 to Arizona, and 0.3 to Nevada. *See* 43 U.S.C. § 617c(a).

The 1922 Compact—including the second compact apportionment—was to take effect once all three Lower Basin states ratified it. *See id*. But Arizona, displeased with the Compact's terms, failed to ratify it. So the issue of how to share the Lower Basin States' apportionment went unresolved. *See Arizona I,* 373 U.S. at 561–62. Nonetheless, because six of the seven Basin states ratified the BCPA, the Secretary began contracting for water with the Lower Basin states.[1] *Id*. at 562.

In 1952, still dissatisfied with its allotment, Arizona sued California in the Supreme Court, invoking the Court's original jurisdiction. *Id*. at 550–51. Nevada and other Basin States intervened, as did the United States. *Id*. at 551.

In proceedings before a Special Master, the United States asserted claims to various water sources in the Colorado River Basin on behalf of twenty-five tribes. But the United States only asserted claims to the Colorado River *mainstream* on behalf of five tribes, and the Nation was not among them. Instead, the United States at that time limited the Nation's claim to the Little Colorado River, one of the tributaries in the Colorado River system. *Navajo I*, 876 F.3d at 1156 n.13. The Nation, along with other tribes, sought the

---

[1] The BCPA lowered the 1922 Compact's ratification threshold: six states would suffice for ratification as long as California was among them and committed to a ceiling on its apportionment. *See* 43 U.S.C. § 617c(a).

appointment of a Special Assistant Attorney General to represent their interests, but their request was denied. The Nation also sought to intervene in proceedings before the Special Master, but its motion to intervene was denied at the United States' urging. *See* Response of the United States to the Motion on Behalf of the Navajo Tribe of Indians for Leave to Intervene, *Arizona I*, 373 U.S. 546 (No. 8, Original).

The Supreme Court issued its decree in 1964. *See 1964 Decree*, 376 U.S. 340. The Court excluded the Little Colorado River—and therefore the Nation's claim—from the adjudication, along with other tributaries in the river system. *See id*. art. VIII(B), 376 U.S. at 352–53. It also affirmed the apportionment of the first 7.5 mafy among the Lower Basin States as specified in the BCPA and the accompanying second compact. *Id*. art. II(B), 376 U.S. at 341–42. The Decree stated that in years where there is less than 7.5 million acre-feet available in the Lower Basin, Interior must first "provide[] for satisfaction of present perfected rights in the order of their priority dates without regard to state lines." *Id*. art. II(B)(3), 376 U.S. at 342. Then, "after consultation with the parties to major delivery contracts and such representatives as the respective States may designate, [the Secretary] may apportion the amount remaining available for consumptive use in such manner as is consistent with" the BCPA, the 1964 Decree, and other applicable federal statutes. *Id*.

The 1964 Decree also determined the *Winters* rights of the five tribes for whom the federal government asserted federally reserved rights. *See id*. at 344–45. Under the *Winters* doctrine, "when the Federal Government withdraws its land from the public domain" for the purpose of establishing an Indian reservation, "the Government, by

implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 138 (1976); *see Winters v. United States*, 207 U.S. 564, 576 (1908).

Water is essential to life on earth, *see* Sandra Alters, *Biology: Understanding Life* 39 (3d ed. 2000), and it is particularly essential for healthy human societies.[2]  Further, beyond the general import of water for societies, in the specific case of the Navajo Nation, news reports have indicated that the Nation's shortage of water have in part caused exacerbation of the risks from COVID-19.  Many homes on the Reservation lack running water, making it difficult for tribal members to wash their hands regularly. *See* Ian Lovett et. al, *Covid-19 Stalks Large Families in Rural America*, Wall St. J. (June 7, 2020), https://www.wsj.com/articles/covid-19-households-spread-coronavirus-families-navajo-california-second-wave-11591553896.  The Nation has as a result been particularly affected by the current pandemic, with a death rate

---

[2] It is by no accident that many of the world's ancient civilizations were born in places such as the Tigris-Euphrates delta, and the valleys of the Nile, Indus, and Yellow Rivers.  Pierre-Louis Viollet, *Water Engineering in Ancient Civilizations*9 (Forrest M. Holly trans., 2017). The engineers of classical Rome built a vast network of aqueducts that, at its peak, spanned over 250 miles in length.  During the Last Gothic War, King Vitiges led an army of Ostrogoths to the gates of Rome itself. The invaders encircled the city and blocked off the aqueducts, keenly aware that the Romans could not survive a prolonged siege without access to water.  *See* Peter J. Aicher, *Guide to the Aqueducts of Ancient Rome* 6 (1995).  In more recent times, Israel, faced with a paucity of water, has developed techniques for managing wastewater and pioneered desalinization techniques.  In 2011, Israel desalinated 296 million cubic meters (MCM) of water out of sea water, and forty-five MCM out of brackish water.  *Water Policy in Israel* 5 (Nir Becker ed., 2013).

significantly higher than that of many other parts of the country. *See id.*[3]

In *Winters*, the United States, acting as trustee of the Fort Belknap Tribe, sought to enjoin upstream diversions on Montana's Milk River from interfering with the Fort Belknap Reservation's downstream diversions. *See Winters*, 207 U.S. at 565. Although the 1888 treaty that established the Reservation made no express provision for tribal water rights to the Milk River, the United States maintained that the water had been impliedly reserved to fulfill the purpose of the reservation as a "permanent home and abiding place" for the Fort Belknap Tribe. *Id*. The Court agreed, noting that the Reservation lands "were arid, and, without irrigation, were practically valueless." *Id*. at 576. The Court applied the Indian canons of construction, under which ambiguities in agreements and treaties with tribes "will be resolved from the standpoint of the Indians," and held that the Tribe was entitled to federally reserved rights to the Milk River. *Id*.; *see id.* at 576–77.

*Winters* set a "solid foundation" for later decisions that reaffirmed the scope of Indian reserved water rights. Robert T. Anderson, *Indian Water Rights and the Federal Trust Responsibility*, 46 Nat. Res. J. 399, 414 (2006). Subsequent decisions have established that these rights are determined by federal, not state law. *See* 1 Cohen's Handbook of Federal Indian Law § 19.03 (Nell Jessup Newton ed., 2019)

---

[3] The vast majority of deaths on the Reservation due to COVID-19 are among people aged sixty and older, including the hataałii, traditional medicine men and women entrusted with preserving the Nation's cultural heritage. Jack Healy, *Tribal Elders Are Dying From the Pandemic, Causing a Cultural Crisis for American Indians*, N.Y. Times (Jan. 12, 2021), https://www.nytimes.com/2021/01/12/us/tribal-elders-native-americans-coronavirus.html.

(Cohen's Handbook). Moreover, tribal water rights may trump water rights of state users, even when those users have been drawing from the water source for a longer time. *See id*.

In awarding five tribes federally reserved water rights, the *Arizona* Court reaffirmed the *Winters* doctrine, noting that "most of the [reservation] lands were of the desert kind—hot, scorching sands—and . . . water from the [Colorado] river would be essential to the life of the Indian people and to the animals they hunted and the crops they raised." *Arizona I*, 373 U.S. at 599. These five tribes received rights to water commensurate with the "practically irrigable acreage" within each tribe's reservation. *Id*. at 600; *see 1964 Decree* art. II(D), 376 U.S. at 343–45. However, the Supreme Court declined to adjudicate the claims of the twenty other tribes for whom the United States asserted claims—including the Nation's. *Arizona I*, 373 U.S. at 595 ("While the [Special] Master passed upon some of these claims, he declined to reach others, particularly those relating to tributaries. We approve his decision as to which claims required adjudication . . . .").

## B

Federal Appellees, through Interior and its Secretary, exercise pervasive control over the Colorado River pursuant to the BCPA, the 1964 Decree, and other components of the Law of the River. *See id*. at 593. The Secretary has discretion to apportion shortfalls in years of shortage, *see id*. at 593–94, and also has the authority to determine whether there is a surplus or shortage of water each year, *see 1964 Decree*, art. II(B)(2)–(3), 376 U.S. at 342.

In 1968, Congress enacted the Colorado River Basin Project Act (the "Basin Act"), which requires Interior to

manage Lake Mead, Lake Powell, and related facilities in coordination and under long-range operating criteria. 43 U.S.C. § 1552(a). Each year, Interior must determine whether there will be enough water to satisfy the 7.5 mafy budgeted among the Lower Basin states, and whether and how much "surplus" water will be available. *See* 73 Fed. Reg. 19,873, 19,875 (Apr. 11, 2008). In 2001 and 2007, Interior adopted "surplus" and "shortage" guidelines to clarify how it determines whether a particular year was a "shortage" or "surplus" year. *See* 66 Fed. Reg. 7772 (Jan. 25, 2001); 73 Fed. Reg. 19,873 (Apr. 11, 2008).

Before adopting the shortage guidelines, the Secretary published a draft environmental impact statement (EIS) discussing Indian Trust Assets, which are defined as legal interests in assets held in trust by the federal government for federally recognized tribes. *See Final Environmental Impact Statement, Colorado River Interim Guidelines for Lower Basin Shortages and Coordinated Operations for Lake Powell and Lake Mead* (*Shortage Guidelines FEIS*) 3-87 (Oct. 2007). The EIS acknowledges that under the *Winters* doctrine, the federal government impliedly "reserved water in an amount necessary to fulfill the purposes of an Indian reservation" for the Navajo Reservation. *Id*. at 3-96. The EIS also states that while "[t]he existence of a federally reserved right for the Navajo Nation to mainstream Colorado River has not been judicially determined at this time[, u]nquantified water rights of the Navajo Nation are considered an [Indian Trust Asset]." *Id*.

## II

The Nation filed a complaint against Federal Appellees under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, challenging the 2001 Surplus Guidelines. *Navajo I*, 876 F.3d at 1159. The Nation alleged that Federal

Appellees violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and breached its trust obligations based on the Federal Appellees' management of the Colorado River without considering or meeting the Nation's unquantified federal reserved water rights and unmet water needs, *Navajo I*, 876 F.3d at 1159. Several parties—Arizona, Nevada, and various state water, irrigation, and agricultural districts and authorities (collectively, "Intervenors")—intervened to protect their interests in the Colorado's waters. *Id*. The district court dismissed the complaint, holding that the Nation lacked standing to bring its NEPA claims and that its breach of trust claim was barred by sovereign immunity.

On appeal, we agreed with the district court that the Nation lacked standing to bring its NEPA claims but reversed and remanded on the breach of trust claim. *Id.* at 1174. We held that the waiver of sovereign immunity in § 702 of the APA "applie[d] squarely to the Nation's breach of trust claim." *Id*. at 1173. Because the breach of trust claim was not barred by sovereign immunity, we instructed the district court to fully consider the claim on its merits, "after entertaining any request to amend the claim more fully to flesh it out." *Id*.

On remand, the Nation twice moved for leave to file an amended complaint. The Proposed Third Amended Complaint (TAC) alleged that the Federal Appellees have failed to (1) "determine the quantities and sources of water required to make the Navajo Nation a permanent homeland for the Navajo People," and (2) "protect the sovereign interests of the Navajo Nation by securing an adequate water supply to meet those homeland purposes." The Intervenors opposed both motions to amend, arguing that because the United States could have asserted the Nation's claim to the

mainstream of the Colorado River in the *Arizona v. California* litigation and the rights to the River were fully adjudicated in that action, the Nation's claim was barred by *res judicata*.

The district court denied both motions to amend and dismissed the Nation's complaint with prejudice.   The district court held that although a general trust relationship exists between the United States and the tribes, the Nation failed to identify a specific trust-creating statute, regulation, or other form of positive law that the federal government violated.  And though the Nation argued that such a specific trust obligation is created under the *Winters* doctrine, the district court held that a determination of whether *Winters* rights attached to the mainstream of the Colorado River was jurisdictionally barred by the Supreme Court's reservation of jurisdiction in *Arizona v. California*.  We conclude that the Nation's claim does not implicate the Court's reservation of jurisdiction, and that it therefore was error for the district court not to grapple with the scope of *Winters* rights available to the Nation in connection with its current requests.

The district court further reasoned that even if it could decide the breach of trust claim, *Winters* rights alone do not give rise to specific and enforceable trust duties on the federal government.  The district court also held that none of the treaties, statutes, and regulations that the Nation cited in support of its trust claim were "specific . . . trust-creating statute[s] or regulation[s] that the Government violated." Finally, the district court held that the Nation could not allege a common law cause of action for breach of trust that is "wholly separate from any statutorily granted right."

We disagree with the district court as to the role of *Winters* rights in establishing enforceable trust duties.

*Winters* rights are necessarily implied in each treaty in which the government took land from Native Americans and established reservations that were to be permanent homes for them. That was the case with the Nation's reservation. Federal Appellees have an irreversible and dramatically important trust duty requiring them to ensure adequate water for the health and safety of the Navajo Nation's inhabitants in their permanent home reservation.

Because the district court concluded that the Nation's attempts to amend its complaint were futile, the district court denied the motion to amend and dismissed the complaint. The Nation timely appealed. Although the district court did not decide the *res judicata* issue in dismissing the Nation's complaint, Intervenors assert that *res judicata* defense on appeal.

This appeal presents three issues. First, we determine whether the Nation's breach of trust claim falls within the Supreme Court's reserved jurisdiction in *Arizona v. California*. If it does, we decide whether that jurisdiction is not only reserved, but also *exclusive*. Second, we determine whether the Nation's claim is barred by *res judicata*. Third, we decide whether the Nation could properly state a claim for breach of trust such that amendment was not futile.

### III

We review a district court's denial of a motion to amend a complaint for abuse of discretion. *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1051 (9th Cir. 2018). "A district court's exercise of discretion based on an erroneous interpretation of the law constitutes an abuse of discretion." *Ahlmeyer v. Nev. Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009). Moreover, "[d]ismissal without leave to amend is improper unless it is clear, upon *de novo* review,

that the complaint could not be saved by any amendment." *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991). Finally, we review a district court's decision to dismiss for lack of subject matter jurisdiction *de novo*. *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122 (9th Cir. 2019).

## IV

### A

We begin with the jurisdictional question. The district court determined it could not decide the Nation's breach of trust claim because it falls within the Supreme Court's reserved jurisdiction under Article IX of the 1964 Decree. Article IX provides that:

> Any of the parties may apply at the foot of this decree for its amendment or for further relief. The Court retains jurisdiction of this suit for the purpose of any order, direction, or modification of the decree, or any supplementary decree, that may at any time be deemed proper in relation to the subject matter in controversy.

*1964 Decree*, art. IX, 376 U.S. at 353. The parties and the district court assumed that this provision reserves the Supreme Court's *exclusive* jurisdiction over—and strips lower courts of jurisdiction to determine—whether the Nation has water rights to a specific allocation from the mainstream of the Colorado River. But in attempting to avoid Article IX's jurisdictional bar, the Nation represents that it does not seek a judicial determination of its rights to the Colorado. The Nation argues that it merely seeks an injunction ordering the Federal Appellees to investigate the

Nation's needs for water, to develop a plan to meet those needs, and to exercise its authority over the management of the Colorado River consistent with that plan.  Under this reading of the Nation's claim, the district court only had to consider whether the Nation needs water to fulfill the promise of establishing the Navajo Reservation as a homeland for the Nation's people.

We agree with the Nation's characterization of its claim. A plain reading of the Nation's complaint makes clear that it does not seek a quantification of its rights in the Colorado River.  The Nation seeks an injunction "[r]equiring the Federal Appellees . . . (1) to determine the extent to which the Navajo Nation requires water . . . (2) to develop a plan to secure the water needed; (3) to exercise their authorities, including those for the management of the Colorado River, in a manner that does not interfere with the plan to secure the water needed . . . and (4) to require the Federal Appellees to analyze their actions . . . and adopt appropriate mitigation measures to offset any adverse effects from those actions." Granting this scope of relief would not require a judicial quantification of the Nation's rights to water from the River. Nor would it require any modification of the *Arizona* Decree. Furthermore, Article VIII(C) of the Decree provides that the Decree does not affect "[t]he rights or priorities, except as specific provision is made herein, of any Indian Reservation."  *1964 Decree*, 376 U.S. at 353.  As discussed *infra*, the Nation's claim is not determined by any specific provision in the 1964 Decree, as none addresses the Navajo Nation's water rights.  The Nation's breach of trust claim thus falls outside the scope of the Decree, and our jurisdiction is proper.

Because the Nation does not seek a judicial determination of its rights to the waters of the Colorado

River, we need not resolve the scope of the Supreme Court's reserved jurisdiction under Article IX.  But we note that the Supreme Court's own interpretation of the Decree does not expressly state whether Article IX's reserved jurisdiction is exclusive.  In the sequel to *Arizona I*, the federal government sought to increase the water allotments for the five tribes that were awarded federally reserved water rights in the original litigation, arguing that the earlier calculations of the practicably irrigable acreage within the reservations were inaccurate.  *Arizona v. California* (*Arizona II*), 460 U.S. 605, 608 (1983).  The Court denied the request, and stated that if not for Article IX, the Court would have been barred by *res judicata* from re-opening the matter.  *Id*. at 617–18.  The Court explained that Article IX was "mainly a safety net added to retain jurisdiction and to ensure that we had not, by virtue of res judicata, precluded ourselves from adjusting the Decree in light of unforeseeable changes in circumstances." *Id*. at 622.  Because the Supreme Court is best positioned to interpret its own Decree, we defer to the interpretation it laid out in *Arizona II* and understand Article IX primarily as an authorization of jurisdiction, rather than a limitation on it.

Because the Nation neither seeks modification of the Decree nor seeks to relitigate any issues resolved in the *Arizona* cases, *see infra*, however, we need not resolve the scope of the Supreme Court's jurisdiction under Article IX. We have jurisdiction to consider the Nation's claim, and the district court erred in holding otherwise.

## B

Having established that we have jurisdiction, we turn to the Intervenors' argument that *res judicata* bars the Nation's claim.  Intervenors argue that the Nation's breach of trust claim is barred by *res judicata* because the Nation effectively seeks a judicial determination of its rights to the

Colorado River, which is a claim that the federal government could have asserted on the Nation's behalf in *Arizona I*, but did not. We reject the Intervenors' argument because the Nation's claim is not barred by *res judicata*.

In *Nevada v. United States*, 463 U.S. 110 (1982), the Supreme Court held that *res judicata* barred the federal government from seeking additional water rights for the Pyramid Lake Tribe beyond the rights the tribe obtained in previous water rights litigation, *id.* at 113, 145. The *Nevada* Court considered "first if the cause of action which the Government now seeks to assert is the same cause of action that was asserted" in previous litigation, and then "whether the parties in the instant proceeding are identical to or in privity with" the parties in the previous litigation. *Id.* at 130 (internal quotation marks omitted). The Court held that the federal government, in a decades-long adjudication that began in 1913, sought to "assert . . . the Reservation's full water rights." *Id.* at 132. Because *Nevada* involved the same parties "asserting the same reserved right" as that adjudicated by the previous litigation, *id.* at 134, the later claim was barred.

In this case, by contrast, the Nation asserts a different claim than the water rights claim the federal government could have asserted on the Nation's behalf in *Arizona I*. The Nation's claim, properly understood, is an action for breach of trust—not a claim seeking judicial quantification of its water rights. The federal government's fiduciary duty to the Navajo Nation was never at issue in *Arizona v. California*, and no final judgment was ever entered on the merits of any question concerning that subject. *Cf. Nevada*, 463 U.S. at 129–30. As the Decree does not affect "[t]he rights or priorities" of Indian Reservation beyond those specifically enumerated, *1964 Decree*, 376 U.S. at 353, the federal

government's fiduciary duty to the Nation remains unaltered by the *Arizona* litigation.

The Nation's breach of trust claim is not barred by *res judicata*.

## C

## 1

Finally, we address whether the Nation's attempts to amend its complaint to plead their substantive breach of trust claim were futile. The Federal Appellees and the Intervenors argue that the district court correctly denied the Nation's motion for leave to amend its complaint, because it could not point to any specific treaty provision, statute, or regulation that imposed a trust obligation on the Federal Appellees. We disagree and hold that the district court should have allowed the Nation to amend its complaint.

This circuit first considered the requirements a tribe must meet to bring a breach of trust action for non-monetary relief in *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569 (9th Cir. 1998). There, the Morongo Tribe challenged a Federal Aviation Administration (FAA) proposal that would have increased air traffic over reservation lands. *Id*. at 572–73. The Tribe sought non-monetary relief under the APA, alleging violations of various statutes and FAA regulations. *Id*. at 572. We held that "unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Id*. at 574.

We addressed this issue again in *Gros Ventre Tribe v. United States*, 469 F.3d 801 (9th Cir. 2006). There, the Gros

Ventre Tribe alleged that the federal government breached its trust obligations "by approving, permitting, and failing to reclaim" two cyanide heap-leach gold mines upriver from the Tribe's reservation. *Id*. at 806. The panel explained that "an Indian tribe cannot force the government to take a specific action *unless a treaty, statute or agreement imposes, expressly or by implication, that duty*." *Id*. at 810 (emphasis added) (quoting *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995)). In holding that the Tribe failed to identify a treaty, statute, or regulation that would create an enforceable trust duty, we observed that the Tribe's treaties with the federal government "at most . . . merely recognize[d] a general or limited trust obligation to protect the Indians against depredations *on Reservation lands*." *Id*. at 812 (emphasis added). Because the Tribe sought an injunction requiring the federal government to "manage resources that exist *off of the Reservation*," we held that no treaty provision imposed an enforceable trust duty that could be vindicated through injunctive relief. *Id*. at 812–13 (emphasis added).

*Morongo* and *Gros Ventre* establish the governing standard here. Although Federal Appellees rely on another strain of cases concerning the need to identify specific statutory bases for obtaining monetary relief under the Tucker Act, 28 U.S.C. § 1491, those cases are not apposite.

The fiduciary claim in this case is one for injunctive relief under § 702 of the APA. In *United States v. Mitchell* (*Mitchell I*), 445 U.S. 535 (1980), individual members of the Quinault Tribe sued the federal government through the Tucker Act, 28 U.S.C. § 1491, over alleged mismanagement of timber resources on their allotted reservation lands, 445 U.S. at 537, 539. The timber was managed by the Secretary of Interior under the General Allotment Act

(GAA).  *Id*. at 537.  The Supreme Court rejected the tribal allottees' argument that the GAA imposed enforceable trust duties on the federal government to manage tribal timber resources in a fiduciary capacity.  *Id*. at 546.  The Court explained that when Congress enacted the GAA, it intended that the federal government hold the land in trust "not because it wished the Government to control use of the land and be subject to money damages for breaches of fiduciary duty, but simply because it wished to prevent alienation of the land and to ensure that allottees would be immune from the state taxation."  *Id*. at 544.  The Court remanded the case to the Court of Claims to consider whether the federal government could be held liable for breach of trust based on any other statutes.  *Id*. at 546.

On remand, the Court of Claims held that the government was subject to suit for money damages based on various statutes and regulations detailing the federal government's responsibilities in managing the tribal timber resources.  *United States v. Mitchell* (*Mitchell II*), 463 U.S. 206, 211 (1983).  The Supreme Court affirmed, holding that the regulations and statutes created an enforceable trust obligation because they accorded the Secretary a "pervasive role in the sales of timber from Indian lands."  *Id*. at 219.  The Court observed that a substantive right to sue under the Tucker Act "must be found in some other source of law, such as 'the Constitution, or any Act of Congress, or any regulation of an executive department.'"  *Id*. at 216 (quoting 28 U.S.C. § 1491).  "[T]he claimant must demonstrate that the source of substantive law he relies upon 'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.'"  *Id*. at 216–17 (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)).

These Supreme Court decisions concerned suits brought for money damages under the Tucker Act, 28 U.S.C. § 1491, and the Indian Tucker Act, 28 U.S.C. § 1505. But this case involves a claim for injunctive relief brought under § 702 of the APA, so we are not bound by those decisions.

A more recent decision, *United States v. Jicarilla*, 564 U.S. 162 (2011), concerned a breach of trust claim in a discovery context and imported requirements similar to those stated in the Tucker Act and Indian Tucker Act cases. In *Jicarilla*, the Court decided whether the Jicarilla Apache Nation (the "Tribe") could assert the "fiduciary exception" to the attorney-client privilege in a suit against the federal government, *id.* at 165. At first, the Tribe sued the government for breach of trust, seeking monetary damages for alleged mismanagement of tribal funds. *Id.* at 166. Then the parties participated in alternative dispute resolution, wherein the government refused to produce certain documents, claiming the attorney-client privilege. *Id.* So the Tribe moved to compel production of those documents. *Id.* at 167. It asserted the "fiduciary exception" to the attorney-client privilege, which states that a trustee cannot assert the privilege against a beneficiary after obtaining legal advice on how to execute its fiduciary obligations. *Id.*

The Court held that the Tribe could not compel the federal government to produce privileged documents in discovery based on the fiduciary exception, because it failed to "point to a right conferred by statute or regulation in order to obtain otherwise privileged information from the Government against its wishes." *Id.* at 178. In doing so, the Court observed that it had previously "found that particular 'statutes and regulations . . . clearly establish fiduciary obligations of the Government' in some areas." *Id.* at 177 (ellipsis in original) (quoting *Mitchell II*, 463 U.S. at 226).

But the Court also explained that "[o]nce federal law imposes such duties, the common law 'could play a role'" in defining the scope of those duties. *Id.* (quoting *United States v. Navajo Nation*, 556 U.S. 287, 301 (2009)). Again, *Jicarilla* was at bottom a suit for monetary relief. Its ruling must be understood against that background.

## 2

Federal Appellees contend that under these precedents, the Nation has failed to state a breach of trust claim because it cannot point to any treaty, statute, or regulation that imposes an affirmative trust duty on the federal government to ensure that the Nation has an adequate water supply. We disagree.

Here, the injunctive relief the Nation seeks would not require the federal government to manage off-reservation resources. Instead, the Nation seeks an injunction compelling the Secretary to determine the extent to which the Reservation requires water from sources other than the Little Colorado River to fulfill the Reservation's purpose of establishing a permanent homeland for the Nation. The mainstream of the Colorado River is appurtenant to the Nation and defines a significant segment of the Reservation's western boundary.

Moreover, neither *Morongo* nor *Gros Ventre* nor *Jicarilla* involved claims to vindicate *Winters* rights, which provide the foundation of the Nation's claim here. Unlike the plaintiffs in those cases, the Nation, in pointing to its reserved water rights, has identified specific treaty, statutory, and regulatory provisions that impose fiduciary obligations on Federal Appellees—namely, those provisions of the Nation's various treaties and related statutes and executive orders that establish the Navajo Reservation and, under the

long-established *Winters* doctrine, give rise to implied water rights to make the reservation viable.

Under *Winters*, the federal government "reserve[d] appurtenant water then unappropriated to the extent needed to accomplish" the purpose of establishing the Reservation as a permanent homeland for the Navajo people. *Navajo I*, 876 F.3d at 1155 (quoting *Cappaert*, 426 U.S. at 138). In *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981), we noted that while "[t]he specific purposes of an Indian reservation . . . were often unarticulated," "[t]he general purpose, to provide a home for the Indians, is a broad one and must be liberally construed," *id.* at 47. It is clear that the Reservation cannot exist as a viable homeland for the Nation without an adequate water supply. As the Court observed in *Arizona I*:

> Most of the land in [the reservations appurtenant to the Colorado River] is and always has been arid. If the water necessary to sustain life is to be had, it must come from the Colorado River or its tributaries. It can be said without overstatement that when the Indians were put on these reservations they were not considered to be located in the most desirable area of the Nation. It is impossible to believe that when Congress created the great Colorado River Indian Reservation and when the Executive Department of this Nation created the other reservations they were unaware that most of the lands were of the desert kind—hot, scorching sands—and that water from the river would be essential to the life of the Indian people and to the

animals they hunted and the crops they raised.

373 U.S. at 598–99.

We stress that *Winters* rights are long-established and clearly qualify as rights "by implication" under a treaty. *Gros Ventre*, 469 F.3d at 810 (quoting *Shoshone-Bannock*, 56 F.3d at 1482). Those necessarily implied rights are just as important as express ones. It is not our province to modify the Supreme Court's definitive law establishing water rights as contained in treaties establishing Native American reservations, whether express or not. None of the twists and turns in the responsible federal agencies' and courts' historical treatment of Indian law has brought the *Winters* declaration of necessarily implied water rights into question.

We hold in particular that, under *Winters*, Federal Appellees have a duty to protect the Nation's water supply that arises, in part, from specific provisions in the 1868 Treaty that contemplated farming by the members of the Reservation. The Treaty provides that individual members of the Nation may select plots of land if they "desire to commence farming." 1868 Treaty, art. V. Tribal members who took up farming would be entitled to "seeds and agricultural implements" to help make this transition. *Id*. art. VII. The Treaty's farming-related provisions, which sought to encourage the Nation's transition to an agrarian lifestyle, would have been meaningless unless the Nation had sufficient access to water.[4] Indeed, in *Winters* itself, the

---

[4] In the Nation's first motion for leave to file a third amended complaint, the Nation sought to add, in addition to its breach of fiduciary duty claim, a claim for breach of the 1849 and 1868 Treaties, but later omitted that claim from its renewed motion. On remand, the district

Court explained that at the time the Fort Belknap Tribe signed its treaty with the federal government, it was the government's policy to change the Tribe's "habits and wants" to those of "a pastoral and civilized people." *Winters*, 207 U.S. at 576.  We do not pass judgment on the wisdom of such a policy, nor on the merits of particular allegations that may be offered relating to agrarian rights, but it is clear that the *Winters* Court based its holding in large part on the fact that without water, the reservation lands could not support an agrarian lifestyle in accordance with government policy.  *See id*. ("The lands were arid, and, without irrigation, were practically valueless.").

That the farming provisions in the 1868 Treaty may serve as the "specific statute" that satisfies *Jicarilla*, *Morongo*, and *Gros Ventre* is consistent with more general principles concerning the interpretation of treaties between the United States and Indian tribes.  The Supreme Court has explained: "A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations." *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675, *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979) (citing *Lone Wolf v. Hitchcock*, 187 U.S. 553 (1979)).  We have inferred a promise of water rights into treaties that contained no explicit reservation of those rights. *See, e.g.*, *Arizona I*, 373 U.S. at 599; *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1268 (9th Cir. 2017).

We did so in *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983), for example, where the Klamath Tribe's treaty

court is instructed that the Nation should be permitted to amend its complaint in this respect if it seeks to do so.

with the United States merely preserved the right to "hunt, fish, and gather on their reservation," *Id.* at 1398.  We recognized that a main purpose of the treaty was to "secure to the Tribe a continuation of its traditional hunting and fishing lifestyle." *Id*. at 1409.  We reasoned that this purpose would have been defeated unless the Klamath Tribe had the right to enjoy and use water sufficient to ensure an adequate supply of game and fish.  *See id*. at 1411.  Although the claimed water rights at issue in that case were "essentially nonconsumptive in nature," *id*. at 1418, *Adair* stands for the broader proposition that we may read water rights into a treaty where those rights are necessary to fulfill the treaty's primary purpose.  *See United States v. Washington*, 853 F.3d 946, 965 (9th Cir. 2017) ("Thus, even if Governor Stevens had made no explicit promise, we would infer, as in *Winters* and *Adair*, a promise to 'support the purpose' of the Treaties.").

Interior's documents also demonstrate that the Federal Appellees have acknowledged their trust responsibilities to protect the Nation's *Winters* rights.  For example, the final EIS relating to Interior's shortage guidelines acknowledges that the federal government impliedly "reserved water in an amount necessary to fulfill the purposes of" the Navajo Reservation. *Shortage Guidelines FEIS*, 3-96. The EIS also states that the Nation's unquantified water rights are considered an Indian Trust Asset, which Interior recognizes as interests that the federal government holds in trust for recognized Indian tribes, and that the federal government must protect. *Id*.

The Nation's breach of trust claim is also strengthened and reinforced by the Secretary's pervasive control over the Colorado River.  The BCPA, which requires the United States and all Colorado River users to "observe and be

subject to and controlled by" the 1922 Compact, apportioned the Colorado River's waters among the Lower Basin states. 43 U.S.C. § 617g(a). But within the general allocation of water that the 1922 Compact entails, the Secretary has pervasive authority "both to carry out the allocation of the waters of the main Colorado River among the Lower Basin States and to decide which users within each State would get water." *Arizona I*, 373 U.S. at 580.

In this respect, the Supreme Court's reasoning in *Mitchell II* is pertinent: just as the statutes and regulations in that case gave the Secretary a "pervasive role in the sales of timber from Indian lands," 463 U.S. at 219, so too do the BCPA and other components of the Law of the River confer broad authority upon the Secretary to manage and contract for Colorado River water, *see, e.g.,* BCPA, 43 U.S.C. § 617d ("No person shall have or be entitled to have the use for any purpose of the water stored as aforesaid except by contract made as herein stated."). This pervasive control over the Colorado River, coupled with the Nation's *Winters* rights, outlines the scope of Federal Appellees' trust duties.

Our holding is consistent with the Supreme Court's decision in *United States v. Navajo Nation*. Although the Court there held that "[t]he Federal Government's liability cannot be premised on control alone," 556 U.S. at 301, the Court also explained that once a plaintiff identifies a specific duty-imposing treaty, statute, or regulation, "*then* trust principles (including any such principles premised on 'control') could play a role in 'inferring that the trust obligation [is] enforceable by damages.'" *Id*. (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 473 (2003)). The Nation—which in any case does not here seek money damages—has identified a specific duty-imposing treaty, as we have explained.

To summarize: We hold that the Nation has successfully identified specific treaty, statutory, and regulatory provisions that, taken together, anchor its breach of trust claim. First, we have the implied treaty rights recognized in *Winters*, which in itself gives the Tribe the right to proceed on a breach of trust claim here; second, the 1868 Treaty, which recognizes the Nation's right to farm Reservation lands and, under *Adair*, gives rise to an implied right to the water necessary to do so; third, the BCPA and other statutes that grant the Secretary authority to exercise pervasive control over the Colorado River; and fourth and finally, the Nation has pointed to Interior regulations and documents in which Federal Appellees have undertaken to protect Indian Trust Assets, including the Nation's as-yet-unquantified *Winters* rights.

Having established that a fiduciary duty exists, we hold that common-law sources of the trust doctrine and the control the Secretary exercises over the Colorado River firmly establish the Federal Appellees' duty to protect and preserve the Nation's right to water. Under *Winters*, when the federal government took the Reservation into trust, it "reserve[d] appurtenant water then unappropriated to the extent needed to accomplish" that purpose. *Navajo I*, 876 F.3d at 1155 (quoting *Cappaert*, 426 U.S. at 138). These rights are recognized as reserved by treaty, applying the canon that in "agreements and treaties with the Indians, ambiguities occurring will be resolved from the standpoint of the Indians." *Winters*, 207 U.S. at 576; *see Washington*, 853 F.3d at 965. Though water rights are not expressly stated in the Nation's treaties with the United States, the *Winters* rights that attach to the Reservation are sufficiently well-established to create an implied fiduciary obligation on the Federal Appellees. *See Gros Ventre*, 469 F.3d at 810 (noting that a specific duty can be imposed by "a treaty,

statute or agreement . . . expressly or by implication.")
(quoting *Shoshone-Bannock*, 56 F.2d at 1482).

We recognize that no court has yet quantified the
Nation's *Winters* rights.  But the fault for the exceedingly
long delay in that respect, if any, lies with Federal Appellees.
As trustee, the federal government has the power to not only
bring water rights claims on behalf of the tribes, but also to
bind them in litigation.  *See Nevada*, 463 U.S. at 135.  When
the Nation tried to intervene in *Arizona v. California*, the
federal government opposed the Nation's motion.  And in
the more than half of a century since the Supreme Court
issued its 1964 Decree, the Nation has never had its *Winters*
rights adjudicated or quantified by any court.[5]  This result is
but one example of what a commentator has described as the
federal government's failure "to secure, protect, and develop
adequate water supplies for many Indian tribes."  Cohen's
Handbook § 19.06.  Indeed, "[i]n the history of the United
States Government's treatment of Indian tribes, its failure to
protect Indian water rights for use on the reservations it set
aside for them is one of the sorrier chapters." [6]  *Id*. (citing
National Water Comm'n, Water Policies for the Future:
Final Report to the President and to the Congress of the
United States, 474–75 (1973)); s*ee also* Anderson, *supra*, at
400.

---

[5] The Nation is actively seeking water from various sources in other
litigation.  *See generally Navajo I*, 876 F.3d at 1156 n.14.

[6] Perhaps recognizing this failure, some members of Congress have
proposed legislation that would empower the Administrator of the
Environmental Protection Agency to "give priority to projects that
respond to emergency situations where a lack of access to clean drinking
water threatens the health of Tribal populations" in the Columbia River
Basin.  S. 421, 117th Cong. § 2 (2021).

The Supreme Court could not have intended to hamstring the *Winters* doctrine—which has remained good law for more than one hundred years—by preventing tribes from seeking vindication of their water rights by the federal government when the government has failed to discharge its duties as trustee. Such a perverse reading of the Court's precedents would render ineffectual the federal government's promise to "charge[] itself with moral obligations of the highest responsibility and trust," *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942), by ensuring that the tribes of this country can make their reservation lands livable. This principle takes on even more importance in an era in which the COVID-19 pandemic renders reservation lands more dangerous to tribal members—particularly when they lack adequate water for health and safety purposes.

The Nation's attempts to amend its complaint were not futile. The Nation can state a cognizable claim for breach of trust because it has identified specific regulations and treaty provisions that can "fairly be interpreted," *Mitchell II*, 463 U.S. at 218, as establishing Federal Appellees' fiduciary obligations to ensure that the Nation's Reservation has the water it needs to exist as a viable homeland for the Navajo people.

At this early stage of litigation, we decline to address whether the Nation's *Winters* rights include rights to the mainstream of the Colorado River or to any other specific water sources. We hold only that the Nation may properly base its breach of trust claim on water rights derived from its treaties with the United States under *Winters*, and so may amend its complaint to so allege.

## V

Because the district court's denial of the Nation's motion for leave to amend and subsequent dismissal of the Nation's complaint were based on legal errors, the court abused its discretion.  Applying the correct legal principles, we hold that the Nation's attempts to amend its complaint were not futile.  We reverse the district court's dismissal of the Nation's complaint and remand to the district court with instructions to permit amendment to the complaint consistent with this opinion.[7]

**REVERSED AND REMANDED.**

LEE, Circuit Judge, concurring:

I write separately to emphasize that the Nation's proposed injunctive relief should not and does not implicate the Supreme Court's retained jurisdiction in *Arizona v. California* (*1964 Decree*), 376 U.S. 340, 353 (1964).

When the Supreme Court first adjudicated the rights to the Colorado River, it issued a Decree listing the Indian tribes and other entities holding present perfected rights to the mainstream.  *Id.* at 344–46.  Article IX of the Decree

---

[7] As the concurrence recognizes, we need not and do not decide whether the Supreme Court's retained jurisdiction in the 1964 Decree is exclusive.  That is because the Nation's claim does not seek a quantification of any rights it may have to the Colorado River mainstream.  If, however, Federal Appellees later determine that they cannot meet their trust obligation to provide adequate water for the Nation unless the jurisdictional question is resolved, then they can petition the Supreme Court for modification of the 1964 Decree.

"retain[ed] jurisdiction . . . for the purpose of any order, direction, or modification of the decree, or any supplementary decree . . ." *Id.* at 353. Since then, there have been several iterations of the *Arizona v. California* litigation, but none has explicitly addressed whether Article IX reserves exclusive jurisdiction for adjudication of rights to the mainstream. *See, e.g.*, *Arizona v. California* (*Arizona II*), 460 U.S. 605, 622 (1983).

In this case, the Nation seeks additional water for its Reservation, and both the parties and the district court considered whether the Supreme Court's retained jurisdiction applied. But our decision does not answer that question, as the Nation's Proposed Third Amended Complaint ("TAC") does not, on its face, actually seek rights to the mainstream.

The Nation's TAC seeks injunctive relief requiring, in part, that the Federal Defendants "determine the extent to which the Navajo Nation requires water from sources other than the Little Colorado River to enable its Reservation to serve as a permanent homeland for the Navajo Nation and its members" and "develop a plan to secure the water needed." The Nation asserts, and our decision affirms, that this proposed injunction does not ask the district court to quantify any rights that the Nation may have to the Colorado River mainstream. This narrow construction of the proposed relief is imperative, as it allows the Nation to pursue its claims without raising the separate and more complex issue of the Supreme Court's retained jurisdiction.

Thus, on remand and in all future proceedings, the TAC's proposed injunctive relief should not be construed as implicitly authorizing a reassessment of the rights to the Colorado River mainstream. In other words, the requested relief that the Federal Defendants develop a plan to meet the

Nation's water needs cannot be used as a backdoor attempt to allocate the rights to the mainstream.  If such rights are to be reassessed, that action may be taken only after resolving the jurisdictional question raised by Article IX of the 1964 Decree.